Charles E. MINES, Jr. aka Charles Anderson, Appellant,

v.

The STATE of Texas, Appellee.

No. 70893.

Court of Criminal Appeals of Texas, En Banc.

Oct. 14, 1992.

Rehearing Denied March 17, 1993.

James R. Jenkins, Waxahachie, for appellant.

Mary Lou Shipley, Dist. Atty., and Robert W. Rucker, Asst. Dist. Atty., Waxahachie, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant was convicted of capital murder. V.T.C.A. Penal Code § 19.03(a)(2). Upon the jury's affirmative findings on the three special issues submitted, the trial

judge sentenced appellant to death.[1] Art. 37.071(b)(1)–(3) and (e), V.A.C.C.P. Appellant presents two points of error in this direct appeal. Art. 37.071(h). We will affirm the trial court's judgment.

In his first point of error, appellant contends the trial court erred in overruling his challenge to the array. At the conclusion of the voir dire process [2], appellant filed and presented to the court a motion alleging the jury in this cause was unlawfully impaneled in that "no black, negroid or colored (the phrase preferred by the Defendant himself) jurors were seated by the Court[.]" [3] Of the three black prospective jurors on the panel, defense counsel peremptorily challenged one and the State so challenged the remaining two. Appellant asserts these two prospective jurors were struck by the State solely because of their race in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Art. 35.261, V.A.C.C.P.[4]

In response to appellant's motion, the prosecutor took the stand and testified as to her reasons for striking the two venirepersons, both of whom were black females. There were two main reasons why the prosecutor struck prospective juror Hamilton. First, Hamilton stated on her juror questionnaire form that she believed in punishment, but not capital punishment. The prosecutor acknowledged, however, that after the three special issues were

explained to Hamilton, she stated that she believed in the death penalty and could answer the issues "yes." Nevertheless, the prosecutor felt Hamilton was tentative in her answers, had difficulty understanding the issues, and tended to agree with whatever question was asked of her. On cross-examination by defense counsel, the prosecutor reiterated these same feelings regarding prospective juror Hamilton and added that Hamilton's answers concerning the death penalty needed to be viewed within the context of her voir dire. The second reason proffered for the peremptory challenge against Hamilton was that she had been a maid in defense counsel's home, and the prosecutor felt that that situation might cause Hamilton to have a bias toward any evidence presented by the defense.

There were several reasons offered by the State for its peremptory challenge of prospective juror Champion, who was a minister's wife. Champion stated on her juror questionnaire form that she did not believe in the death penalty because of her religious training, but upon voir dire examination she stated she could answer affirmatively the punishment issues. The prosecutor felt that "[Champion's] answers to questions still tended to be some [sic] equivocal in regard to the death penalty." Moreover, in the prosecutor's opinion, Champion had difficulty understanding the third special issue and the question of in-

1. Appellant was convicted of murdering Vivian Moreno, by striking her on the head with a hammer, in the course of committing or attempting to commit the burglary of her home. In a companion case, appellant was convicted of the attempted capital murder of Frances Moreno, Vivian's daughter, which offense arose out of the same incident. Appellant was sentenced to life imprisonment for the offense against Frances.

2. The record does not indicate if and when the jury, as a whole, was sworn, but the trial on the merits began immediately following the conclusion of the pretrial hearing on the motion challenging the array. The State has not taken issue with the timeliness of appellant's motion. Cf. *Rousseau v. State*, 824 S.W.2d 579, 581 (Tex. Crim.App.1992) (timely motion under Art. 35.-

261 made before jury, as a whole, is impanelled).

3. Appellant also complained "that of the sixty jurors talked to and of the eighty some odd actually seated for voir dire of the sixty, only three were of the same race as [he]", thus intimating a claim under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). However, no other evidence of a systematic scheme of exclusion was offered, so nothing is presented for our review.

4. Since appellant's trial was after the effective date of Art. 35.261, the provisions of that article apply. *Hill v. State*, 827 S.W.2d 860, 865 (Tex. Crim.App.1992); *Rousseau*, 824 S.W.2d at 581.

sanity.[5] On cross-examination, the prosecutor acknowledged that Champion said she could answer the special issues, but she felt Champion had previously been "very emphatic" in her disbelief in the death penalty.

After explaining why she peremptorily challenged these two black venirewomen, the prosecutor gave her unsolicited reasons for striking seven similarly situated white female venirepersons. The prosecutor also noted for the record that she did not strike a third black female on the jury panel who initially indicated on her questionnaire that she could assess the death penalty if the offense involved a child. According to the prosecutor, after the law was explained to this venirewoman she stated unequivocally that she could follow the law and answer the special issues according to the evidence. Defense counsel peremptorily challenged this venirewoman.

The trial judge entered on the record his findings of fact and conclusions of law, noting that he was able to observe the prospective jurors' tone of voice, physical reactions to questions, and any pauses, delays, or spontaneity in their answers to questions. The court found the prosecutor's reasons for striking the challenged venirepersons were related to an issue in the case, namely whether the prospective jurors could affirmatively answer the punishment issues knowing the consequences thereof. The court further found that all jurors, regardless of race, were questioned in the same manner on the same subject matter for essentially the same amount of time. The court concluded the challenged black venirepersons were struck for race-neutral reasons. Appellant's challenge to the array was thus overruled.

■ For claims made pursuant to Art. 35.261 and *Batson,* this Court has held that the correct standard of appellate review is "clearly erroneous." *Hill,* 827 S.W.2d at

865, citing *Williams v. State,* 804 S.W.2d 95, 101 (Tex.Crim.App.1991); *Tennard v. State,* 802 S.W.2d 678 (Tex.Crim.App.1990); and *Whitsey v. State,* 796 S.W.2d 707, 726 (Tex.Crim.App.1989) (Opinion on State's Motion for Rehearing). That is, the reviewing court must view the record in the light most favorable to the trial judge's ruling and must not disturb that ruling unless the court is "left with a firm conviction that a mistake has been committed." *Harris v. State,* 827 S.W.2d 949, 955 (Tex. Crim.App.1992), citing *Williams* and *Whitsey,* supra. This standard of review is necessarily a deferential one as a trial judge's findings on a claim of purposeful discrimination during jury selection are largely based on credibility evaluations made during voir dire and the *"Batson"* hearing. *Robinson v. State,* 851 S.W.2d 216, 226–27 (Tex.Crim.App.1991) (pending on rehearing on other grounds). Thus, in determining whether a trial judge's finding of no purposeful discrimination was clearly erroneous, we consider the challenged prospective juror's voir dire as a whole, as well as other relevant circumstances of the voir dire of the panel, and accord due deference to the trial judge's ruling. *Sterling v. State,* 830 S.W.2d 114 (Tex.Crim.App.1992).

■ The record reflects that prospective juror Hamilton initially stated she was against the death penalty, but she recognized there were situations where capital punishment might be appropriate. Hamilton then agreed, however, with the prosecutor's assessment that she did not believe in the death penalty under any circumstances. The prosecutor explained the juror's role in the verdict at the punishment phase and reviewed the three punishment issues with her. After discussing these issues with the prosecutor, Hamilton stated that she now believed in the death penalty. Hamilton answered affirmatively the prosecutor's questions on whether she could answer the punishment issues and whether

---

**5.** Appellant entered pleas of not guilty by reason of insanity to the charges alleged against him in the two indictments.

she believed society had a right to have the death penalty. Hamilton also stated that she was a former maid for defense counsel's mother, but that she had not worked in his home since the 1960s [6] and that affiliation would not influence her. Before concluding her voir dire examination of Hamilton, the prosecutor once again broached the subject of the death penalty. Hamilton stated on her questionnaire that she did not believe in the death penalty because she "had not thought about it really[.]" Since completing her questionnaire, Hamilton had considered the death penalty and concluded the death penalty was appropriate punishment depending on the crime committed and how it was committed.

■ Prospective juror Champion also indicated on her questionnaire form that she did not believe in the death penalty as a result of her religious training, but then her statements to the prosecutor regarding her beliefs toward capital punishment became unclear. Upon questioning about the three special issues rather than the death penalty per se, Champion stated that she could answer "yes" to the three punishment issues if the State met its burden of proof.[7] The prosecutor reviewed other relevant trial issues with Champion and then returned to the question of the death penalty. Champion expressed her view that "if the evidence really proved" that the defendant was incapable of rehabilitation, she would not be reluctant to impose the death penalty as punishment. The evidence proven at trial was the factor which would change Champion's "way of thinking" regarding the death penalty.

In his brief, appellant argues the prosecutor's reasons for peremptorily challenging Hamilton and Champion are contrary to direct statements made by the prospective jurors, are frivolous, and do not rebut the prima facie evidence of racial discrimination. The record reflects the prosecutor's reasons for striking these persons from the venire are clear, specific, relevant to issues in this cause, and, most importantly, are facially race-neutral. In our opinion, these reasons are sufficient in and of themselves to rebut a prima facie case of discrimination. The issue to be resolved is whether appellant has sustained his burden of persuasion and rebutted the race-neutral explanations given by the State at the *Batson* hearing. *Williams*, 804 S.W.2d at 101.

In his brief, appellant directs us to testimony in the record from the prospective jurors which is contrary to the race-neutral explanations offered by the State for its two peremptory challenges. Specifically, appellant cites the testimony of venireperson Hamilton where she stated she could answer affirmatively the special issues, that she believed in the death penalty, and that her work as a maid in defense counsel's home would not influence her.[8] As to venireperson Champion, appellant notes she too stated she could answer "yes" to the punishment issues, including the third issue which initially confused her, and that she was not reluctant to give the death penalty as punishment in spite of her religious training. Appellant also points out that Champion had formerly served on a grand jury. Because there is evidence in the record which controverts the State's neutral explanations for its peremptory challenges, appellant asserts the State's reasons for striking the two were necessar-

6. The record is unclear as to the precise date of Hamilton's employment.

7. Initially, Hamilton indicated she could never answer "yes" to the third punishment issue. At this juncture the State challenged her for cause. However, questioning by defense counsel revealed Hamilton was confused about the issue, and thus counsel rehabilitated this prospective juror.

8. Appellant also contends the prosecutor's assertion that Hamilton was tentative in her answers is contrary to the record, but he does not cite to any specific testimony to support his contention. Whether Hamilton was in fact tentative during her voir dire depends largely upon circumstances which can only be observed during her voir dire examination, i.e., her demeanor, tone of voice, mannerisms, eye-contact with counsel, etc., to which the appellate court is not privy. It is precisely this reason why the reviewing appellate court accords great deference to the trial judge's findings.

ily racially motivated. On the basis of the facts of the voir dire and the trial court's findings and conclusions, we do not agree with appellant.

 The State has the right, as does the defense, to ask proper questions of prospective jurors so that it may intelligently exercise its peremptory challenges. *Williams*, 804 S.W.2d at 107. Generally, in capital murder prosecutions the State concentrates a substantial portion of its voir dire examination reviewing the prospective juror's beliefs on capital punishment and the three punishment issues. This was true in this case, especially as to venirepersons Hamilton and Champion, who initially stated strong opposition to the death penalty and then changed their opinions. The record reflects, however, that the State questioned these prospective venirepersons on other relevant trial issues, i.e. burden of proof, presumption of innocence, insanity defense, etc., as were all questioned venirepersons. Appellant has not shown any disparate treatment in the questioning of the jurors or that the prosecutor's explanations were pretexts for intentional discrimination, and indeed such would be difficult in light of the prosecutor's explanations for her strikes of similarly situated white venirepersons. *See generally Cantu v. State*, 842 S.W.2d 667, 689 (Tex.Crim.App.1992). Moreover, we find the circumstances in this case present the precise situation where a peremptory challenge is appropriate, *viz:* the prospective juror is not challengeable for cause, but the prosecutor does not believe the venireperson will be a favorable juror for the State, or perhaps the prosecutor considers the person disingenuous because of her change of opinion.

We have reviewed the record and find the trial judge's findings and conclusions are supported thereby. The prosecutor's explanations for her strikes of Hamilton and Champion are race-neutral and logically related to issues presented by this case. *See Tennard v. State*, 802 S.W.2d 678 (Tex. Crim.App.1990). We find no lack of meaningful questioning of the prospective jurors nor disparate treatment, as we have stated. Therefore we hold appellant has failed to show purposeful discrimination by the State in the exercise of its peremptory challenges. The trial judge's findings and conclusions were not clearly erroneous. Appellant's first point of error is overruled.

In his second point of error, appellant contends the sentencing scheme in Art. 37.-071, V.A.C.C.P., was unconstitutional as applied to him (as violative of the Eighth and Fourteenth Amendments to the United States Constitution and Art. I, § 13 of the Texas Constitution), and that the trial court erred in failing to instruct the jury at the punishment phase of trial on the mitigating evidence of his insanity. Appellant appears to present two claims in this point. First, appellant argues there was sufficient evidence of his incompetency and insanity to require the trial judge to take the case from the jury, refrain from imposing sentence, and impanel a jury to determine his competency to stand trial, pursuant to Art. 46.02, V.A.C.C.P.[9] Secondly, appellant raises what is now commonly known as a *"Penry* claim." [10]

 On June 8, 1989, prior to imposition of sentence in this case (and the companion case), appellant filed a written motion to prevent the imposition of the death penalty. Appellant asserted the evidence showed he

9. Appellant did not invoke specific provisions of Art. 46.02. Section 4(c) provides in pertinent part:
 If the issue of incompetency to stand trial is raised other than by written motion in advance of trial pursuant to Subsection (a) of Section 2 of this article and the court determines that there is evidence to support a finding of incompetency to stand trial, the court shall set the issue for determination at any time prior to the sentencing of the defen-

dant. If the competency hearing is delayed until after a verdict on the guilt or innocence of the defendant is returned, the competency hearing shall be held as soon thereafter as reasonably possible, but a competency hearing may be held only if the verdict in the trial on the merits is "guilty." ...

10. *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

was incompetent to stand trial and was insane during commission of the offenses for which he was found guilty; thus, appellant contended the jury verdicts [11] were contrary to the law and facts. Appellant invoked Art. 46.02 in both his written and oral motions and moved the trial court to follow the provisions of that article rather than impose sentence or, alternatively, impose a life sentence instead of the death sentence. The motion was overruled.

We hold the trial judge did not abuse his discretion in overruling appellant's motion. The trial judge held a pretrial hearing, in accordance with Art. 46.02, to determine appellant's competency to stand trial on the indictment in this cause as well as the companion case. The jury from this hearing found appellant competent to stand trial in both causes. At trial on the merits, appellant pled not guilty by reason of insanity and presented extensive testimony on this defensive issue. In the jury charge at guilt/innocence, the trial judge instructed the jury on the issue of insanity and submitted to them, *inter alia*, a "not guilty by reason of insanity" verdict form. The jury obviously rejected appellant's claim of insanity. At punishment, appellant presented testimony from the same psychiatrist who testified at both the competency hearing and the trial on the merits. In light of the recent adjudication of appellant's competency, the jury's rejection of the insanity defense, and appellant's presentation of the same doctor's testimony at punishment, the trial court did not abuse its discretion by refusing to refrain from assessing punishment and holding another competency hearing. *Gomez v. State*, 492 S.W.2d 486 (Tex.Crim.App.1973).

■ As to his *Penry* claim [12], appellant first generally reviews the cases supporting the facial validity of Art. 37.071,[13] and its treatment of mitigating evidence [14], and then reviews the evidence in this case as to insanity and incompetency.[15] An extensive amount of testimony was given at trial regarding appellant's mental condition, which we now review.[16]

During the State's case-in-chief, there was little testimony regarding appellant's behavior or his mental faculties following his arrest. According to one investigator from the City of Waxahachie, appellant rationally responded to questions when advised of his rights and followed instructions from the investigator. A former Waxahachie investigator, Maurice Lowrey, who participated in appellant's arrest on May 30, 1988, and booking at the police station, stated appellant would talk with officers but he refused to tell them his name. Eventually appellant gave a confession which established appellant had previously been arrested for robbery in September of 1987. He remained incarcerated in

---

**11.** On March 13, 1989, a competency hearing was held to determine whether appellant was competent to stand trial on the indictments charging him with capital murder and attempted capital murder. A jury returned a verdict of competent in both cases. A separate jury was impanelled for trial in the cause *sub judice.*

**12.** The State contends appellant's claim is waived. The punishment charge was submitted to the jury on June 2, 1989; the *Penry* decision was rendered June 26, 1989. Appellant's claim is not therefore waived. *See Black v. State*, 816 S.W.2d 350 (Tex.Crim.App.1991) (Campbell, J., concurring).

**13.** Since appellant's trial, art. 37.071 has been amended by the 72nd Legislature. Art. 37.071, V.A.C.C.P. (Supp.1991).

**14.** Appellant cites, e.g., *Stewart v. State*, 686 S.W.2d 118 (Tex.Crim.App.1985); *Clark v. State*,

717 S.W.2d 910 (Tex.Crim.App.1986); *Quinones v. State*, 592 S.W.2d 933 (Tex.Crim.App.1980); *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Crim.App. 1979); and *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

**15.** We will not review or consider any of the evidence presented during appellant's competency hearing, as that was tried to a different jury. We focus our attention on the evidence heard by the jury on the trial of the merits.

**16.** We have reviewed in great detail the testimony from the guilt/innocence phase regarding appellant's sanity as this testimony may be considered by the jury in its deliberations on the punishment issues. *See Cantu*, 842 S.W.2d at 674–75, citing *Santana v. State*, 714 S.W.2d 1 (Tex.Crim.App.1986).

the Ellis County Jail until May 19, 1988, when the robbery charges against him were dismissed, and he was sent to Terrell State Hospital.[17] Appellant was released from Terrell on May 24, 1988, and he committed this capital murder three days later, on May 27, 1988. Lowrey stated, based upon his conversations with appellant,[18] that he did not believe appellant was insane because he was "self-educated" and very intelligent, had a pleasant manner and good attitude, and was aware of the circumstances in which he was situated.

James Hill, Captain of the Waxahachie Police Department, testified he gave miranda warnings to appellant on May 31st. On the "statutory warning form", Hill indicated the name of the person warned was "John Doe" because appellant, when asked his name, would answer "over there" and look up at the wall. Appellant answered in this manner approximately three times, but Hill thought it was unusual only in the sense that appellant was uncooperative.

The defense presented extensive testimony in its case from Dr. Ricardo Schack, a psychiatrist. Schack was appointed by the trial court in the spring of 1988 to examine appellant. Schack's first visit with appellant was April 13, 1988, at the Ellis County Jail, at which time appellant was very agitated, verbally abusive, and experiencing delusions of grandeur.[19] Schack conducted his assessment of appellant in the jail because the jailers recommended appellant not be removed from his cell because he was agitated.

Schack again met with appellant in December of 1988, and, overall, met with appellant five or six times (for a total of about ninety minutes) during which time appellant became less agitated but his be-

havior did not change significantly. On his last few visits, Schack attempted to converse with appellant but found it very difficult, as talking to appellant was like "a constant argument." During the spring and winter time periods, Schack believed appellant was "mentally impaired" and diagnosed appellant as suffering from manic depressive illness, also known as bipolar disorder, which Schack stated:

> ... is an illness that is characterized by—probably the best way to say it is that the brain kind of goes into overdrive. The thinking becomes irrational. The person starts to think irrational thoughts, becomes very impulsive. Can or may become violent. Can or may become rather dangerous.

> And what happens, classically, ... is that the manic depressive is a patient that kind of makes sense and you're nodding as they're talking and all of a sudden you find you are shaking your head because they have stopped making sense. The thinking is too grandiose. They're going to get rich, they're very wealthy and they have a massive amount of wealth. It's not the classic person who is listening to voices or talking to themselves or anything. But it's more like an illness of degrees.

> A person shows very impaired judgment, will spend ... for example, spend [sic] large amount [sic] of money that they don't have.... And they will make statements that are very, very grandiose.

Schack stated that, in his opinion, this was a medical condition, but that, as a physician, he "tend[ed] to be very biological."

According to Schack, persons with bipolar disorder may change their behavior pat-

---

**17.** An assistant district attorney, David Jordan, testified he handled appellant's civil commitment proceeding, and that State law prohibits the civil commitment of a person against whom criminal charges are pending.

**18.** Other than taking appellant's confession, Lowrey and appellant mainly discussed politics and sports, of which appellant was especially knowledgeable. Lowrey also stated that after

appellant was charged with the present offense, he visited appellant once in the jail, but on a second visit appellant refused to talk to him.

**19.** Appellant told Schack he had large amounts of money, was world famous, and that he did not need to talk to him. Schack said appellant also insulted him.

terns daily, and it is possible for a person to be "insane" but yet be alert, aware of his surroundings, intelligent, pleasant, courteous, and able to talk on a number of subjects. In Schack's opinion, on the commission date of this offense, appellant was insane, i.e., he was incapable of knowing his behavior was wrong. See V.T.C.A. Penal Code § 8.01(a). At the time of trial in this cause, Schack had not examined appellant in approximately seven months.

On cross-examination of Schack, the prosecutor established that Schack's practice was not primarily concerned with treating persons charged with criminal offenses, and in fact Schack preferred not to. Also established was that, during his incarceration, appellant could communicate in complete sentences, knew he was in jail, understood the function of a lawyer but did not want one representing him, lacked respect for the court system, and did not want to talk to Schack during his jail visits. Schack stated that appellant's lack of respect for the courts and his poor judgment in not wanting legal representation could be components of insanity although he recognized "normal people" sometimes exercise poor judgment as well. Appellant's agitation and argumentative personality could also be components of insanity. Schack listed specific components which were indicative of manic depressive disorder, *viz:* pressure, speech, flight of ideas, irritability, lack of need of sleep, impaired judgment, being argumentative, and mood swings. Schack testified each of these was found in appellant to some degree.

Moreover, Schack stated that bipolar disorder is cyclical, meaning "[i]t can be extremely variable, from months to years to weeks, from individual to individual." The disorder may go into remission even without treatment, and when it is subsiding a person so afflicted is capable of following instructions and conforming his behavior to expectations. Appellant appeared reasonably normal during his trial and a previous hearing, according to Schack.

In rebuttal, the State presented testimony from two psychiatrists. The first was Dr. James Grigson who specializes in forensic or legal psychiatry.[20] Grigson, too, was appointed by the court to examine the appellant. Grigson stated he attempted to examine appellant at the Ellis County Jail on November 15, 1988, but he refused the examination after Grigson advised him of his rights, so this jail visit lasted five minutes "at the most". In March of 1989, Grigson only observed appellant for approximately thirty to ninety minutes, as again appellant would not converse with him. Based on these two observations and his review of appellant's hospital records, Grigson concluded appellant was "not suffering from a serious, severe mental disease or defect that would prevent him from knowing the difference between right and wrong[,]" and he saw no signs or symptoms indicating appellant was suffering from bipolar disorder. Grigson elaborated that he had observed persons with bipolar disorder, and stated they are generally severely depressed or suicidal but do not engage in criminal behavior. In examining persons charged with criminal offenses, Grigson found the majority of the persons are either "incompetent because they are street people that have been turned out from state hospitals", are sociopaths who repeatedly commit offenses, or are drug abusers.

On crossexamination, Grigson admitted he had been nicknamed "Dr. Death" by the news media, and that he has been criticized by the American Psychiatric Association, a group that does not believe in the death penalty and does not believe a person's propensity for future dangerousness can be predicted.

**20.** Grigson explained this discipline:

Forensic psychiatry is that branch of medicine primarily involving psychiatry and the law. Most of the work I do is examining individuals charged with criminal offenses to determine their competency to stand trial or their sanity at the time of the alleged offense, or whether or not they represent a continuing threat to society.

The second psychiatrist to testify was Dr. Quynh Nguyen, who is one of three psychiatrists at Terrell State hospital. Nguyen conducted the initial evaluation of appellant when he was brought to the hospital on May 19, 1988, pursuant to a protective custody order. During an initial examination, Nguyen evaluates the client's behavior, mood, affect, rate of speech, and thought content. Nguyen stated appellant very ably described the circumstances which led to his commitment[21] and discussed the presidential candidates, was coherent but talked "around," and denied having any suicidal or homicidal ideas or a history of mental illness or drug abuse.

Nguyen also physically examined appellant, and found no evidence of medical illness or organic dysfunction which would cause physical or mental impairment. Each member of a treatment "team"[22] also evaluated appellant and determined he was not mentally ill and therefore did not recommend he be committed to the hospital. The diagnostic consensus of the treatment team was that appellant "had a mixed personality disorder with paranoia, passive, aggressive, antisocial features." Nguyen stated that a personality disorder was not the same as a mental disease or defect, with the difference being that a person with a personality disorder is able to know right from wrong, make his own judgments, and is responsible for his own actions.

At the guilt/innocence phase of trial, the jury arguments from both the State and defense counsel concentrated primarily on the issue of insanity. By its verdict, the jury rejected appellant's claim of insanity at the time of commission of this offense.

At punishment, the State again offered the testimony of Dr. Grigson. Through a hypothetical question based on a person with six prior convictions,[23] a diagnosis of an antisocial personality, and the facts of this offense, Grigson stated in his opinion the hypothetical person would commit future acts of violence and represented a "total threat" to society. The State rested, and the defense again called Dr. Schack to testify. He testified that proper treatment of bipolar disorder would reduce the odds that appellant would commit future acts of dangerousness.

In the *Penry* case, the United States Supreme Court determined our death penalty statute was unconstitutional as applied to Penry because the punishment issues did not provide the jury with a vehicle to express its "reasoned moral response" to his evidence of mental retardation and childhood abuse, and therefore the jury could not give mitigating effect to that evidence. The Supreme Court agreed with Penry that his mitigating evidence had relevancy to his moral culpability beyond the scope of the special issues, and thus, an instruction "informing the jury that it could consider and give effect to the mitigating evidence ... by declining to impose the death penalty" was necessary. *Penry*, 492 U.S. at 328, 109 S.Ct. at 2952. Consequently, a constitutional capital sentencing scheme is one that allows the jury to consider relevant mitigating evidence, and provides the jury with a vehicle to express its reasoned moral response to that evidence in arriving at an individualized punishment assessment. *Goss v. State*, 826 S.W.2d 162, 164 (Tex. Crim.App.1992).

In *Lackey v. State*, 819 S.W.2d 111 (Tex. Crim.App.1989) (Opinion on Motion for Rehearing), and *Goss*, this Court elaborated on the necessary criteria for a successful *Penry* claim. Evidence of the quality and

---

**21.** Appellant asserted he had been arrested in Waxahachie for "no reason" other than he had more than $1,000 in his possession.

**22.** The team consisted of a psychologist, a nurse, a social worker, and a rehabilitation coordinator.

**23.** The State introduced into evidence pen packets from the state of Virginia indicating appellant had prior convictions for felonious assault and unlawful wounding, and pen packets from the state of North Carolina showing prior convictions for assault by pointing a gun, communicating threats, and felonious breaking or entering.

character of *"Penry* evidence" is that which is specifically relevant to a defendant's "moral culpability." *Goss,* 826 S.W.2d at 164. We noted that moral culpability was not related to the lessening of the defendant's guilt for commission of the capital offense, but rather to his "death-worthiness." *Id.* at 165. This concept of deathworthiness is best understood as an individualized assessment of the appropriateness of the death penalty, given the offense *and the offender. Lackey,* 819 S.W.2d at 133 (emphasis added). The evidence presented at trial, that which the defendant claims is in fact "mitigating," is relevant to the individualized assessment of the propriety of the death penalty for the offender if there is a nexus between this evidence and the circumstances of the offense which tends to excuse or explain the commission of the offense, suggesting that particular defendant is less deserving of a death sentence. *Lackey,* 819 S.W.2d at 135, n. 10; *Goss,* 826 S.W.2d at p. 165; and *Nobles v. State,* 843 S.W.2d 503, 506 (Tex. Crim.App.1992). If the jury is presented relevant mitigating evidence, it must be afforded a means by which to give that evidence adequate consideration. The question then becomes whether the Art. 37.071(b) issues are a constitutionally sufficient means.

Appellant, like Penry, was afforded a competency hearing prior to trial on the merits, and also pled not guilty by reason of insanity. As in *Penry,* the jury rejected both claims of incompetency and insanity. The similarities, however, end there as appellant's "mitigating" evidence is qualitatively different than that presented in *Penry,* and therefore is not relevant, *beyond* the scope of the special issues, to the jury's individualized assessment of appellant's moral culpability for this offense.

The evidence presented by appellant as to his mental condition is relevant to the special issues and is fully encompassed thereby. As to the first punishment issue,

evidence of any mental impairment suffered by appellant can be given full mitigating effect as it goes to his ability to act deliberately. Schack testified that persons with bipolar disorder may have irrational thoughts or experience impulsive behavior. This evidence is logically related to whether appellant committed this offense deliberately and with a reasonable expectation that death would result. In defense counsel's argument, he framed the issue and ably applied the facts, and, indeed, his argument illustrates the relevancy of the mitigating evidence to the issue. Counsel contended the evidence showed appellant had never done anything deliberately in his life and was incapable of expectation. He also argued the commission of this offense was not planned, but reactionary and animalistic. The jury could express its reasoned moral response to appellant's claims of mental disease or defect by answering "no" to the first special issue. The relevancy of his mitigating evidence of his mental condition did not exceed the scope of the question.

The same is true as to the second special issue, to-wit: whether appellant would commit future acts of violence and be a continuing threat to society. There was testimony that *if* appellant were suffering from bipolar disorder,[24] proper treatment (of which he had received none since his incarceration) would reduce the odds he would commit future acts of violence; however, there was no testimony of any long term mental illness precluding appellant from conforming his behavior to societal norms. We find appellant's mitigating evidence was encompassed within the jury's consideration of the second punishment issue; that is whether the commission of this offense was an aberration as a result of appellant's alleged mental incapacity, or whether it was indication of appellant's progressively violent behavior and his propensity to commit future acts of violence.

The *Penry* analysis under the third special issue, which was submitted in this

---

**24.** Both Drs. Grigson and Schack agreed a person with bipolar disorder was treatable. However, in Grigson's opinion, appellant was not suffering from this disease.

cause, is much like that under the first special issue. The evidence of appellant's mental condition was directly relevant to whether appellant acted reasonably or was capable of rational thought. In his jury argument, defense counsel implicitly acknowledged the inherent relevancy of this evidence within issue three by stating he was "not even going to argue [ ] that [issue]" and conceded that appellant's response to the provocation was unreasonable, "but it was done by a person who was insane at the time or at least suffering from some mental disease or defect." If the jury so believed, the third issue provided an adequate means by which the jury could express its reasoned moral response to appellant's mitigating evidence and answer "no" to the issue.

This case was a classic example of "a battle of the experts" and was resolved by the jury's credibility determinations regarding those experts in conjunction with the other evidence presented at trial and each juror's own observations during trial. The jury's rejection of Dr. Schack's opinion regarding appellant's mental condition and defense counsel's theory of this case does not indicate a lack of a vehicle by which the jury could express its reasoned moral response to appellant's mitigating evidence.[25] In this case, the punishment issues encompassed the relevant and mitigating character of appellant's evidence, and allowed the jury a vehicle by which to give effect to that evidence. We hold Art. 37.071(b) was not unconstitutional as applied to appellant in this cause. Appellant's second point of error is overruled.

The judgment of the trial court is affirmed.

BENAVIDES, J., concurs in the result.

---

**25.** See *Moody v. State*, 827 S.W.2d 875, 896 (Tex.Crim.App.1992) (evidence of defendant's commission to mental institution for drug and alcohol treatment can be given its full mitigating effect through the special issues).

**1.** The importance of the consideration of mitigating evidence was stressed in *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978,

---

BAIRD, Judge, dissenting.

The nexus requirement which the majority assigns to *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) has no basis in Eighth Amendment jurisprudence. Moreover, there is sufficient evidence within the record to demonstrate appellant was entitled to a vehicle allowing the jury to give effect to his mitigating evidence.

## I.

I find no basis in *Penry*, or in its predecessors, for requiring a nexus between a defendant's mitigating evidence and the charged offense. This Court first suggested a nexus requirement in *Lackey v. State*, 819 S.W.2d 111, 137 n. 10 (Tex.Cr.App. 1991) (Op. on reh'g). Writing for the majority, Judge Campbell assigned the nexus requirement to Justice O'Connor's opinion in *California v. Brown*, 479 U.S. 538, 544, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring). *Lackey v. State*, 819 S.W.2d at 137 n. 10. Therefore, a review of the relevant Federal and State decisional authority is necessary.

## A.

The Texas capital sentencing scheme was first addressed by the Supreme Court in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The Court held "the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors." *Jurek*, 428 U.S. at 272, 96 S.Ct. at 2956.[1] Noting that our capital sentencing scheme did not specifically address "mitigating factors," the Supreme Court acknowledged our assurance that we

---

2991, 49 L.Ed.2d 944 (1976), where the Court stated:

While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment [citation omitted], requires consideration of the character and record of the individual offend-

would interpret the "second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show". *Id.* The Court held our capital sentencing scheme passed constitutional muster because "Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function." *Id.*, 428 U.S. at 276, 96 S.Ct. at 2958.

In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court considered the constitutionality of a statute which limited the consideration of mitigating evidence.[2] The Court held:

> [W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case [footnote omitted], not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. [footnote omitted].

*Lockett*, 438 U.S. at 604, 98 S.Ct. at 2964–2965 (emphasis in original). The Court further noted "a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Id.*, 438 U.S. at 605, 98 S.Ct. at 2965.

The Oklahoma Court of Criminal Appeals adopted a view that mitigating evidence was not relevant unless it tended to provide a legal excuse to criminal responsibility. The court held:

> There is no doubt that the petitioner has a personality disorder. But all the evidence tends to show that he knew the difference between right and wrong at the time he pulled the trigger, and that is the test of criminal responsibility in this State. [citation omitted]. For the same reason, the petitioner's family history is useful in explaining why he behaved the way he did, but it does not excuse his behavior.

*Eddings v. State*, 616 P.2d 1159, 1170 (Okl. Cr.1980). The United States Supreme Court reversed, holding, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S.Ct. 869, 876–877, 71 L.Ed.2d 1 (1982) (emphasis in original).

In *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the defendant was convicted of forcible rape and murder. At the punishment stage, the trial judge instructed the jury to consider and weigh all aggravating and mitigating circumstances but cautioned that the jury "must not be swayed by mere sentiment, conjecture, *sympathy*, passion, prejudice, public opinion or public feeling" when as-

---

er and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

**2.** Ohio Rev.Code Ann. § 2929.04(B) (1975) provided:

> Regardless of whether one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment and proved beyond a reasonable doubt, the death penalty for aggravated murder is precluded when, considering the nature and circumstances of the offenses and the history, character, and condition of the offender, one

or more of the following is established by a prepondence [preponderance] of the evidence:

> (1) The victim of the offense induced or facilitated it.

> (2) It is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation.

> (3) The offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity.

sessing punishment.[3] *Brown*, 479 U.S. at 539, 107 S.Ct. at 838. Brown was sentenced to death. The California Supreme Court reversed, holding the instruction to disregard any "sympathy factor" raised by the evidence violated the Eighth Amendment. *People v. Brown*, 40 Cal.3d 512, 220 Cal.Rptr. 637, 649, 709 P.2d 440, 452 (1985). The United States Supreme Court reversed, holding the instruction did not prevent the jury from considering the mitigating evidence but merely warned the jury against basing its verdict entirely on sympathy. *Brown*, 479 U.S. at 542–543, 107 S.Ct. at 840. In her concurring opinion, Justice O'Connor stated:

> [E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are *attributable* to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. This emphasis has long been reflected in Anglo–American jurisprudence. As this Court observed in *Eddings*, the common law has struggled with the problem of developing a capital punishment system that is "sensible to the uniqueness of the individual." [citation omitted]. *Lockett* and *Eddings* reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. Thus the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime rather than mere sympathy or emotion.
>
> Because the individualized assessment of the appropriateness of the death pen-

alty is a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence, I agree with the Court that an instruction informing the jury that they "must not be swayed by mere sentiment, conjecture, passion, prejudice, public opinion or public feeling" does not by itself violate the Eighth and Fourteenth Amendments to the United States Constitution. *At the same time, the jury instructions— taken as a whole—must clearly inform the jury that they are to consider **any** relevant mitigating evidence about a defendant's background and character, or about the circumstances of the crime.*

*California v. Brown*, 479 U.S. at 545, 107 S.Ct. at 841 (O'Connor, J., concurring).

In *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), the defendant's sole mitigating evidence consisted of a stipulation that his disciplinary record in prison, both before and after the charged offense, was without incident. Franklin requested the jury be instructed to consider any evidence they felt mitigated against the death penalty and that the jury be entitled to return a negative answer to either of the statutory punishment issues in order to avoid the imposition of a sentence of death. The trial judge refused the requested instructions and charged the jury with the first and second punishment issues in Tex.Code Crim.Proc.Ann. art. 37.-071(b),[4] and instructed the jury to consider all evidence presented at the guilt/innocence and punishment phases of the trial. *Franklin v. Lynaugh*, 487 U.S. at 168–170, 108 S.Ct. at 2324–2325. We affirmed. *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr. App.1985).

---

**3.** All emphasis is supplied by the author unless otherwise indicated.

**4.** At the time of Franklin's trial, Tex.Code Crim. Proc.Ann. art. 37.071(b) provided:

> On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with reasonable

expectation that the death of the deceased or another would result;
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Before the Supreme Court, Franklin contended the Eighth Amendment was violated because our capital sentencing scheme prevented the jury's consideration of his mitigating evidence. The Supreme Court rejected Franklin's argument, holding the mitigating evidence of good behavior could be adequately considered within the second statutory punishment issue. *Franklin v. Lynaugh,* 487 U.S. at 177, 108 S.Ct. at 2329.

In a concurring opinion, Justice O'Connor expressed her concern for the jury's inability to "give effect" to mitigating evidence:

Under the sentencing procedure followed in this case the jury could express its views about the appropriate punishment only by answering the special verdict questions regarding the deliberateness of the murder and the defendant's future dangerousness. To the extent that the mitigating evidence introduced by petitioner was relevant to one of the special verdict questions, the jury was free to give effect to that evidence by returning a negative answer to that question. *If, however, petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its "reasoned moral response" to that evidence.* If this were such a case, then we would have to decide whether the jury's inability to give effect to that evidence amounted to an Eighth Amendment violation. In my view, however, this is not such a case. The only mitigating evidence introduced by petitioner was the stipulation that he had no record of disciplinary violations while in prison. It is undisputed that the jury was free to give mitigating effect to this evidence in answering the special verdict question regarding future dangerous-

ness. While it is true that the jury was prevented from giving mitigating effect to the stipulation to the extent that it demonstrated positive character traits other than the ability to exist in prison without endangering jailers or fellow inmates, that limitation has no practical or constitutional significance in my view because the stipulation had no relevance to any other aspect of petitioner's character. Nothing in Lockett or Eddings requires that the sentencing authority be permitted to give effect to evidence beyond the extent to which it is relevant to the defendant's character or background or the circumstances of the offense. [citation omitted].

*Franklin v. Lynaugh,* 487 U.S. at 186, 108 S.Ct. at 2333 (O'Connor, J., concurring).

The following term, in *Penry,* the Supreme Court was again presented with the issue of whether our capital sentencing scheme violated the Eighth Amendment. At his trial, Penry presented mitigating evidence that he was mentally retarded and he suffered from organic brain damage resulting in poor impulse control and the inability to learn from experience. Penry further presented evidence that he had been seriously abused as a child. In the punishment charge, the trial judge submitted the three statutory punishment issues required under art. 37.071(b), and refused Penry's request for an additional instruction authorizing a grant of mercy based upon Penry's mitigating evidence. We affirmed. *Penry v. State,* 691 S.W.2d 636 (Tex.Cr.App.1985).

In *Penry,* Justice O'Connor, incorporating her concurrences from *Brown,* and *Franklin,* and speaking for a majority, reversed, holding that the Texas capital sentencing scheme was unconstitutional as applied because the jury was not provided a vehicle to give effect to Penry's mitigating evidence. *Penry,* 492 U.S. at 319–323, 109 S.Ct. at 2947–2949. The Court emphasized at the outset:

Underlying *Lockett* and *Eddings* is the principle that punishment should be di-

rectly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that *defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.*"

*Penry v. Lynaugh,* 492 U.S. at 319, 109 S.Ct. at 2947.

The Court found Penry's mitigating evidence of mental retardation, organic brain damage and childhood abuse was "beyond the scope of the special issues" and could not be given effect in context of the statutory punishment issues without "appropriate jury instructions" that provided the jury a vehicle to "consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Penry,* 492 U.S. at 317, 109 S.Ct. at 2946 (quoting *Lockett,* 438 U.S. at 607, 98 S.Ct. at 2966). The Court explained that while the jury could have found that appellant's evidence militated against the imposition of the death penalty, the jury was constrained to answer each of the statutory punishment issues in the affirmative. *Penry,* 492 U.S. at 320–325, 109 S.Ct. at 2448–2450. The Supreme Court emphasized:

> In order to ensure "reliability in the determination that death is the appropriate punishment in a specific case," [citation omitted] *the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime.*

*Id.,* 492 U.S. at 328, 109 S.Ct. at 2951 (quoting *Woodson,* 428 U.S. at 305, 96 S.Ct. at 2991). The Texas capital sentencing scheme was unconstitutional as applied because, while Penry was able to present mitigating evidence, the jury was effectively precluded from giving effect to that mitigating evidence. *Id.,* 492 U.S. at 329, 109 S.Ct. at 2952.

### B.

This Court first implied a nexus requirement in *Gribble v. State,* 808 S.W.2d 65 (Tex.Cr.App.1990). In *Gribble,* the defendant introduced evidence of an impoverished and

> insecure childhood in which his mother was institutionalized for a severe mental illness and his father imprisoned for burglary ... During the first several years of his life, [Gribble] and the other children were shuffled among relatives, never living in one place for very long.
>
> * * * * * *
>
> After his parents were released from their respective confinements, [Gribble] lived for a time with his mother. She had since divorced his father and remarried, living with her new husband and the children in a shack without running water somewhere in the mountains of Tennessee. Within a few months, appellant's step-father disappeared, leaving his mother pregnant and without food for the two youngest children. Unable to care for her family, appellant's mother spent much of her time in bars, often bringing strange men home at night.

*Gribble,* 808 S.W.2d at 75. There was evidence that Gribble's mother sexually abused him as a child. *Id.,* 808 S.W.2d at 75. Gribble further introduced expert psychiatric testimony that Gribble's early experiences

> provided a substantial explanation for the appellant's subsequent history of violence, and how the contrast of his violent behavior with his positive personality traits were indicative of severe mental illness, depression, and psychotic illusions of the kind experienced by his mother. [The psychoanalyst] concluded that [Gribble] developed a delusive fear of sexual domination, and that throughout his adult life this fear intermittently erupted into acts of violence, which

[Gribble] forced upon women that, in his fantasies, he feared they might force upon him. Invariably his victims were women with whom he was acquainted on a casual basis and, following his sexual assaults upon them, he customarily acted with incongruous, even bizarre, familiarity, more characteristic of an intimate encounter than a brutal attack.

*Id.*, 808 S.W.2d at 75. The trial judge refused Gribble's requested jury instructions "which would collectively [authorize] the jury, irrespective of its answers to the statutory punishment questions, to decide that he should not be put to death." *Id.*, 808 S.W.2d at 75. We reversed, holding that "all these circumstances [of appellant's childhood were] widely regarded, according to some contemporary social standards, as redeeming personality traits or factors which tend to ameliorate fault." *Gribble*, 808 S.W.2d at 76 [citation omitted]. Therefore, we concluded that Gribble was denied a vehicle by which the jury could "consider and give effect to" his mitigating evidence.[5]

In *Lackey v. State*, 819 S.W.2d 111 (Tex. Cr.App.1991) (Op. on reh'g), the defendant presented evidence of his "disadvantaged background and emotional or mental problems." *Lackey*, 819 S.W.2d at 129.[6] Lackey requested, and the trial judge refused, an instruction on mitigating evidence in the punishment charge. We distinguished Lackey's mitigating evidence from that of Penry, as follows:

Although appellant's background and character evidence is relevant to the concerns of special issue two ... the miti-

gating evidence in the instant case is otherwise irrelevant to an individualized assessment of the deathworthiness of appellant. Appellant's background evidence [did] not tend to excuse or explain his criminal act as did the evidence presented by *Penry* ... Furthermore, there [was] little or no *connection* between his background and character evidence and the facts and circumstances of his criminal acts in the instant case.

*Lackey*, 819 S.W.2d at 134.

For the first time, the court suggested a nexus requirement. In footnote 10, Judge Campbell explained:

Justice O'Connor seems to further require some nexus between the mitigating evidence and culpability for the crime. See *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (concurring opinion). If moral or personal culpability is reduced only when the criminal act (murder) is "attributable to a disadvantaged background, or to emotional and mental problems," then mitigating evidence relevant to the defendant's character, background, mental condition, or circumstances of the offense must also be connected with or somehow help to explain or excuse the commission of the offense by this defendant. See e.g., *Gribble v. State*, 808 S.W.2d 65 (Tex.Cr.App.1990) (Evidence of either actual or imagined sexual abuse of appellant tended to ameliorate fault for appellant's intermittent acts of violence against women. Appellant was thought of as stable, hard working and polite, but his sexual fantasies combined with drugs

---

5. Our research reveals that a defendant has sustained a *"Penry"* claim before this Court in only six published cases: *Gribble v. State, supra; Ramirez v. State,* 815 S.W.2d 636 (Tex.Cr.App. 1991); *Ex parte Goodman,* 816 S.W.2d 383 (Tex. Cr.App.1991); *Ex parte McGee,* 817 S.W.2d 77 (Tex.Cr.App.1991); *Ex parte Williams,* 833 S.W.2d 150 (Tex.Cr.App.1992); *and, Richard v. State,* 842 S.W.2d 279 (Tex.Cr.App.1992). With the exception of *Gribble,* the defendants in each of the other cases sustained their claim on the basis of an extremely low IQ and/or mental retardation.

6. The record revealed Lackey's potentially relevant mitigating evidence to be: (1) a low level of intelligence, shown by extremely substandard IQ test scores and a very poor school record; (2) a turbulent childhood and a troubled relationship with his father; (3) a youthful age (twenty-three) at the time of the offense; (4) voluntary intoxication and "alcoholic black-out" at the time of the offense; and, (5) a history of "periodic drinking" resulting in the inability to control his drinking once initiated. *Lackey,* 819 S.W.2d at 129.

or alcohol developed into true psychosis resulting in violent behavior.).

*Lackey,* 819 S.W.2d at 135 n. 10. However, Judge Campbell, acknowledged that a nexus requirement was in conflict with the Supreme Court's holdings in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Judge Campbell stated:

> We recognize, however, that a nexus requirement would seem to be in conflict with *Lockett v. Ohio* [citation omitted], and *Eddings v. Oklahoma* [citation omitted].
>
> > [The] Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.
>
> > \* \* \* \* \* \*
>
> > [A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.

*Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965; *see Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

In *Eddings, supra,* the Court found that the sentencer may not be precluded, as a matter of law, from considering relevant mitigating evidence.

*Lackey,* 819 S.W.2d at 135, n. 10.

In *Richardson v. State,* 1991 WL 99949 (Tex.Cr.App., No. 68,934, delivered June 12, 1991), a plurality held Richardson was not entitled to a *"Penry* instruction" because he failed to establish a nexus between the his alleged abusive background and his mental and emotional impairment as an adult. The plurality stated:

> [Appellant] fail[ed] to establish any connection between alleged childhood abuse and its subsequent effect on appellant. There is simply no *Penry* evidence presented by the appellant's nexus argument. This Court will not engage in analysis of a theory that is illogical on its face and not supported by the record.

*Richardson v. State.* Consequently, appellant's request for a vehicle to allow the jury to consider and give effect to his mitigating evidence was rejected.[7]

In *Goss v. State,* 826 S.W.2d 162 (Tex.Cr. App.1992), a plurality of the Court restated the nexus requirement:

> [M]itigating evidence is relevant to the jury's individualized assessment of the propriety of death if there is a nexus

---

**7.** Richardson further argued that his "significant worth" to society as an artist and a poet was mitigating. Evidence was presented attesting to Richardson's artistic talents. The plurality held:

> Rather than attempt to shoehorn appellant's artistic and poetic abilities into the ambit of the second special issue, we choose to confront this issue directly and hold that the appellant's ability to draw pictures and write poems in the context of this case has no mitigating value in the sense that it was relevant to the jury making a "reasoned moral response" in voting on the special issues nor do these abilities have any particular relevance to the appellant's moral culpability outside the special issues. In this particular case, we think that appellant's artistic talents do no

more than strike an emotional chord that would cloud the jury's deliberations in reaching a decision.

*Richardson v. State,* slip op. pgs. 6–7.

Several ministers testified concerning Richardson's "religious devotion." The plurality held:

> The evidence of appellant's religious devotion is *Franklin* evidence and could be properly addressed by a jury answering issue number two. Appellant's jail house conversions demonstrate nothing more than his ability to adapt to a structured prison environment ... The jury had ample opportunity to give effect to any mitigating value of appellant's religious zeal when they deliberated on the issue of future dangerousness. [citation omitted].

*Richardson v. State,* slip op. pg. 11.

between the mitigating evidence and the circumstances surrounding the crime that might, from the viewpoint of society, reduce the defendant's "blameworthiness." In other words, the evidence must tend to excuse or explain the criminal act, so as to make that particular defendant not deserving of death.

*Id.,* 826 S.W.2d at 165 (footnote omitted). Therefore, as the plurality of the Court interpreted the Supreme Court's opinion in *Penry,* a defendant's mitigating evidence is relevant to a jury's consideration of a defendant's "deathworthiness" only if there is a nexus between the mitigating evidence and the charged offense.

Reviewing Goss' mitigating evidence of good character, a troubled childhood, and intoxication at time of the offense, the plurality held the mitigating evidence introduced did not rise to the level of *Penry-*type evidence because:

> No testimony was offered by Appellant as to any mental disorder or physiological damage actually suffered by Appellant that would help explain why he "was less morally culpable than defendants who have no such excuse" ... [citation omitted] ... None of the evidence presented by appellant's witnesses sought to explain the connection between the apparently isolated problems of his childhood and the commission of the crime.

*Goss,* 826 S.W.2d at 166 [citation omitted]. Therefore, the plurality determined that no vehicle was required in order for the jury to consider and give effect to the mitigating evidence. *Id.*

For the first time, in *Nobles v. State,* 843 S.W.2d 503 (Tex.Cr.App.1992), a majority of this Court utilized the nexus requirement to dispose of the defendant's *"Penry"* claim:

> [W]here the evidence presented by defendant's witnesses failed to show a connection between the events they described and the commission of the crime, then that "evidence is not relevant, *beyond the scope of the special issues,* to the

jury's individualized assessment of Appellant's moral culpability for the crime." *Goss v. State* [826 S.W.2d at 162].

Applying the principle espoused in *Goss,* the evidence presented in the cause *sub judice* is likewise not relevant beyond the scope of the special issues. Evidence of appellant's unfortunate childhood was not, without some testimony indicating a nexus between his childhood circumstances and the commission of the crime, helpful to the jury's consideration of the special issues or indicative of a lessened moral blameworthiness.

*Nobles v. State,* 843 S.W.2d at 506 (emphasis in original).

### C.

A majority of this Court has elected to limit the application of *Penry* to virtually identical scenarios. The vehicle used by the majority to accomplish this narrow application is the requirement of a nexus between the mitigating evidence and the charged offense, resulting in an interpretation of *Penry* clearly inconsistent with Eighth Amendment jurisprudence. *See Lackey,* 819 S.W.2d at 135 n. 10 ("We recognize ... that a nexus requirement would seem to be in conflict with *Lockett v. Ohio* [citation omitted] and *Eddings v. Oklahoma* [citation omitted].").

The constitutionality of the Tex.Code Crim.Proc.Ann. art. 37.071 rests on the breadth with which the statute permits a capital jury to consider and give effect to mitigating evidence. In *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court upheld our capital sentencing scheme based upon our assurances that "the sentencing jury [would] have adequate guidance to enable it to perform its sentencing function." *Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958. With today's opinion, the majority once again makes it clear that the assurances we gave the Supreme Court in *Jurek* are forgotten. *See, Ex parte Baldree,* 810 S.W.2d 213, 220 (Tex.Crim.App.1991) (Baird, J., dissenting).

The *Penry* Court did not limit the application of the Eighth Amendment to only mitigating evidence which is connected with the charged offense. By now requiring such a nexus we thwart the intent of *Penry* because we preclude the jury from giving effect to aspects of a defendant's character and background which, though relevant, may not be connected to the charged offense. The jury, hearing of appellant's manic-depression, might have believed that appellant's mental illness militated against the sentence of death even without a nexus between the mitigating evidence and the charged offense.[8] Nonetheless, absent a vehicle, the jury was unable to express its reasoned moral response to that evidence.

In my view, the nexus requirement restricts the Eighth Amendment and violates the explicit holding of *Penry* that a jury must be able to "consider and give effect to *any* mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime." *Penry*, 492 U.S. at 328, 109 S.Ct. at 2951 (emphasis in original). Appellant was entitled to a vehicle permitting the jury to consider and give effect to appellant's mental illness because such mitigating evidence was "beyond the scope" of the punishment issues provided by art. 37.071 and had "practical and constitutional significance" to appellant's moral culpability. Without such a vehicle, our capital sentencing scheme violated the Eighth Amendment and was unconstitutionally applied to appellant.

## II.

Assuming, arguendo, that a nexus is required, I believe the majority erroneously distinguishes appellant's mitigating evidence from that in *Penry*.

In *Goss*, this Court stated:

mitigating evidence is relevant to the jury's individualized assessment of the propriety of death if there is a nexus between the mitigating evidence and the circumstances surrounding the crime that might, from the viewpoint of society, reduce the defendant's 'deathworthiness.'

*Id.*, 826 S.W.2d at 165. Moreover, this Court ruled that Goss' mitigating evidence was dissimilar to *Penry* because it failed to show " 'any *mental disorder* or physiological damage actually suffered by Appellant that would help explain why he was less morally culpable than defendants who have no such excuse'...." *Goss*, 826 S.W.2d at 166 (citation omitted). Therefore, as the majority interprets *Penry*, to warrant an instruction on the consideration of mitigating evidence outside the scope of the statutory issues, a defendant must demonstrate that: (1) he suffers from a mental disorder or physiological damage (*Goss*, 826 S.W.2d at 162, *and*, *Gribble*, 808 S.W.2d at 75–76); and, (2) a nexus exists between the mitigating evidence and the charged offense (*Lackey*, 819 S.W.2d at 134; *and*, *Nobles*, 843 S.W.2d at 506). Appellant has met both prongs.

The majority spends considerable effort discussing Dr. Schack's diagnosis of appellant's possible manic-depression yet fails to recognize the similarity between appellant's mitigating evidence and that in *Penry*. *Mines*, op. pgs. 948, 951. Dr. Schack testified that appellant suffered from a mental illness, namely, manic-depression. Manic depression, also known as bipolar disorder, is classified by the American Psychiatric Association as a mental disorder. *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. 1987) (DSM–III–R). The *DSM–III–R* describes the diagnostic criteria of a Severe Manic Episode of a bipolar disorder: "Almost continual supervision required in order to *prevent physical harm to self or to others*." *Id.*, at 218.

Dr. Schack stated that individuals suffering from bipolar disorder have poor impulse control. Moreover, bipolar disorder is commonly believed by the psychiatric

---

**8.** The majority opinion notes that appellant committed the offense three days after he was released from his civil commitment to Terrell State Hospital. *Mines*, op. pg. 948.

community to have a biological basis caused by chemical imbalances occurring in the brain. Dr. Schack testified:

> We can now trace it almost to the same degree the brain goes into overdrive. We have biological tests that we can apply that are hard to come by, but you can actually see the brain of a manic depressive. While they are in a manic status, there is an unbelievable activity as compared with a normal person.
>
> And this person will—will have episodes, relapses, so to speak. They will go on and get better and then they will have another manic episode again maybe years down the road.

Therefore, appellant's mitigating evidence is comparable to that of Penry, and specifically, is evidence of a "mental disorder" which has a physiological (biological) basis. *See, Goss v. State*, 826 S.W.2d at 162.[9]

Dr. Schack's testimony established a nexus between the appellant's mental illness and the charged offense. Dr. Schack testified that appellant suffered from a bipolar disorder at the time of the charged offense and stated:

... [Manic-depression] is an illness that is characterized by—probably the best way to say it is that the brain kind of goes into overdrive. The thinking becomes irrational. The person starts to think irrational thoughts, becomes very impulsive. *Can or may become violent. Can or may become rather dangerous.*

As appellant suffered from the mental illness at the time of the charged offense, which could have caused him to become violent or dangerous, clearly a nexus has been demonstrated. *See, Goss v. State*, 826 S.W.2d at 166; *Penry v. Lynaugh*, 492 U.S. at 320, 109 S.Ct. at 2947; *and, Lackey v. State*, 819 S.W.2d at 134.

Our societal disapproval of punishing individuals who are incapable of controlling their behavior, or who are unable to appreciate the wrongfulness of their actions is deep and longstanding.[10] *See, Penry v. Lynaugh*, 492 U.S. at 330–332, 109 S.Ct. at 2953–2954; *Ford v. Wainwright*, 477 U.S. 399, 406–410, 106 S.Ct. 2595, 2600–2602, 91 L.Ed.2d 335 (1986); *Ex parte Jordan*, 758 S.W.2d 250, 254 (Tex.Crim.App.1988); *and,* 4 W. Blackstone, *Commentaries* 234–25.

9. During the punishment phase of the trial, the State also presented evidence concerning appellant's mental illness. In the direct examination of Dr. James P. Grigson, the State proposed the following hypothetical:

[THE STATE] Dr. Grigson, assuming that you are considering a person who has been convicted of the offense of ... that he uses that hammer, also, to attack an eighty-year-old woman with at least eight blows to her head, which causes her death, who then takes property from that home.

And assume further that that person *has been found to have antisocial personality.* Do you have an opinion as to whether there is a probability that that person will commit continuing acts of violence that will constitute a threat to society?

[DR. GRIGSON] Yes, I do.

[THE STATE] And what is that opinion?

[DR. GRIGSON] *Absolutely* the person *you described* will commit future acts of violence and does represent *a total threat* to society.

The *Diagnostic and Statistical Manual of Mental Disorders*, (3d ed. 1987) (DSM–III–R) defines the mental disorder, Antisocial Personality Disorder, assumed by the State in their hypothetical, as:

The essential feature of this disorder is a pattern of irresponsible and antisocial behav-

ior beginning in childhood or early adolescence and continuing into adulthood....

Lying, stealing, truancy, vandalism, initiating fights, running away from home, and physical cruelty are typical childhood signs. In adulthood the antisocial pattern continues, and may include failure to honor financial obligations, to function as a responsible parent or to plan ahead, and an inability to sustain consistent work behavior. These people fail to conform to social norms and repeatedly perform antisocial acts that are grounds for arrest....

People with Antisocial Personality Disorder tend to be irritable and aggressive and to get repeatedly into physical fights and assaults, including spouse- or child-beating ... Finally, they generally have no remorse about the effects of their behavior on others; they may even feel justified in having hurt or mistreated others. After age 30, the more flagrantly antisocial behavior may diminish, particularly sexual promiscuity, fighting, and criminality.

10. Dr. Schack also testified that while suffering from his illness, appellant was unable to understand the wrongfulness of his conduct.

Appellant's mitigating evidence of mental illness is precisely the type of mitigating evidence which demands an "individualized sentencing determination...." *Penry*, 492 U.S. at 315–316, 109 S.Ct. at 2945.

Finally, appellant's mitigating evidence is comparable to the "two-edged sword" evidence in *Penry*. Appellant's mitigating evidence falls beyond the scope of the second statutory punishment issue requiring a vehicle for the jury to give effect to the evidence. During trial, testimony by both Dr. Schack and Dr. Grigson indicated that bipolar disorder is cyclical and recurs if not properly treated. Untreated, appellant posed a continuing threat to himself or others. Thus, while the evidence tended to diminish appellant's moral culpability for the offense, the cyclical nature of appellant's mental disorder militated toward an affirmative finding of the statutory punishment issues in art. 37.071. Consequently, the jury was confronted with a situation in which they could have believed appellant's culpability was diminished because he committed the offense as a result of his mental illness, and yet, they were constrained to answer the statutory punishment issues affirmatively. *Compare, Penry*, 492 U.S. at 322, 109 S.Ct. at 2949.

The majority refers to appellant's jury argument concerning the mitigating evidence. *Mines*, op. pgs. 951–952. Argument of counsel cannot be a substitute for a vehicle to give effect to the mitigating evidence. Acknowledging that Penry argued to the jury that his mitigating evidence supported a negative finding to the statutory punishment issues, the Supreme Court then held:

> In order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,' the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime.

*Penry*, 492 U.S. at 318, 109 S.Ct. at 2951 (citations omitted). Furthermore, the majority states:

> This case was a classic example of "a battle of the experts" and was resolved by the jury's credibility determinations regarding those experts in conjunction with the other evidence presented at trial and each juror's own observations during trial.

*Mines*, op. pg. 952. Merely allowing appellant an opportunity to present mitigating evidence does not alleviate the error stemming from the jury's lack of a vehicle to give effect to such evidence. Neither jury argument or the ability to introduce of mitigating evidence substitute for a vehicle allowing an "individualized assessment" of the mitigating evidence.

Finally, the majority attempts to distinguish appellant's mitigating evidence from that presented in *Penry.*

> Appellant, like Penry, was afforded a competency hearing prior to trial on the merits, and also pled not guilty by reason of insanity. As in *Penry*, the jury rejected both claims of incompetency and insanity. The similarities, however, end there as appellant's "mitigating" evidence is qualitatively different than that presented in *Penry*, and therefore is not relevant, *beyond* the scope of the special issues, to the jury's individualized assessment of appellant's moral culpability for this offense.

*Mines*, op. pg. 951 (emphasis in original). However, the majority fails to state how or why the mitigating evidence presented in the instant case "is qualitatively different than that presented in *Penry*." The majority's inability to demonstrate any differences supports my argument that appellant's mitigating evidence is not "qualitatively *different*" from *Penry*, but very *similar.*

Therefore, I believe appellant was entitled to a vehicle for the jury to express its reasoned moral response to appellant's mitigating evidence. Because art. 37.071 failed to provide such a vehicle, the Texas capital sentencing scheme operated in an unconstitutional manner as applied.

For these reasons, I respectfully dissent.

CLINTON and MALONEY, JJ., join this opinion.