

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-77,068

---

### CHARLES E. BROWNLOW, Jr., Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL
### FROM CAUSE NO. 32512-422 IN THE 422nd DISTRICT COURT
### KAUFMAN COUNTY

---

**SLAUGHTER, J., delivered the opinion of the Court in which KEASLER, HERVEY, RICHARDSON, YEARY, NEWELL, KEEL, and WALKER, JJ., joined. KELLER, P.J., joined the Court's opinion except for point of error 2, in which she concurred.**

### O P I N I O N

In April 2016, a jury convicted appellant of capital murder for the October 2013

slaying of Luis Gerardo Leal-Carillo ("Carillo") committed during the course of a robbery.

*See* TEX. PENAL CODE § 19.03(a)(2).  Pursuant to the jury's answers to the special issues set

forth in Texas Code of Criminal Procedure article 37.071, sections 2(b) and (e)(1), the trial judge sentenced appellant to death. TEX. CODE CRIM. PROC. art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises eight points of error. Based upon our review of the record, we affirm appellant's conviction for capital murder. However, at the time of trial, the trial judge did not have the benefit of the Supreme Court's decision in *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore I*"), in which the Supreme Court rejected this Court's former standard for evaluating intellectual-disability claims as set forth in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004). Thus, in following the law in effect at the time of appellant's trial, the trial judge informed the jury that *Briseno* was the proper standard for evaluating appellant's intellectual-disability claim. He also required the expert witnesses to tailor their testimony to that standard. As a result, the jury was prevented from evaluating appellant's claim of intellectual disability under a United States Supreme Court-approved diagnostic framework, in violation of his constitutional rights. We conclude that appellant was harmed by the pervasive influence of the *Briseno* standard at his trial and, thus, he is entitled to a new punishment hearing. Accordingly, we vacate appellant's death sentence and remand this cause for a new punishment hearing.

**Background Facts**

At around 3 p.m. on October 28, 2013, appellant was with his mother at her home in Terrell, Texas, when they got into an argument about whether his mother would continue

---

[1] Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

funding his cell phone. After appellant attempted but failed to order a smart phone using his mother's laptop computer, appellant shot his mother in the head, killing her. He took her credit, bank, and debit cards; her driver's license; and his own social security card. Appellant then poured gasoline in the room where he had killed his mother and set fire to her home. Along with the items he had already collected, appellant gathered his dog, a laptop computer, his gun, and two boxes of ammunition. He then left in his mother's white Ford Focus.

Appellant drove to the home of his aunt Belinda Walker, who also lived in Terrell. Upon arriving, appellant kicked in Walker's door, entered her home, and shot and killed her. Although appellant testified that he "ain't never had no problem" with his aunt, she apparently had recently told appellant that she could no longer keep his dog and he needed to come get it. After killing his aunt, appellant later drove to an ATM and attempted to withdraw cash using his mother's debit card, but was unable to make it work. He eventually rented a room at the Super 8 motel in Terrell.

At approximately 5:30 p.m., appellant visited the home of his friend, Kris Humphreys. Humphreys spoke with appellant at the doorway and invited him to come back later that evening. Shortly before 10:00 p.m., appellant returned to Humphreys' home. Humphreys and his girlfriend, Stephanie Jewell, saw appellant pull up to the house. By this time, however, Humphreys had heard about the death of appellant's mother and knew that the police were looking for appellant. When appellant knocked on the door, Humphreys refused to let him in. Appellant was angry and began hitting the door. Believing themselves to be

in danger, Humphreys and Jewell barricaded themselves in a bedroom by shoving a large wooden armoire in front of the door and then covering themselves with a mattress. Humphreys heard appellant break a window and forcibly enter the home. Appellant fired four to six bullets into the barricaded bedroom. Although neither he nor Jewell were wounded, Humphreys yelled that he had been shot in an attempt to dissuade appellant from firing additional shots. The plan evidently worked because appellant left. Appellant next went to the home of his friends Jason Wooden and Kelleye Sluder, where appellant shot and killed them both.

At approximately 10:20 p.m., Appellant appeared on the video surveillance system of Ali's Market in Terrell. Appellant entered the store, walked to the cooler, and took out a beer. He then walked to the counter where Carillo, an Ali's Market employee, was on the telephone. Appellant rummaged around in his pockets, then went outside and retrieved a gun from the car. When appellant re-entered the store, he returned to the counter, aimed the gun at Carillo, and pulled the trigger. The gun jammed, but appellant pulled the trigger a second time, fatally shooting Carillo.[2] Appellant then took two twelve-packs of beer from the store's cooler to his car. He returned to the store and attempted to open the cash register, but was unsuccessful. Appellant then stepped over Carillo's body and took Carillo's gun and an extra magazine from a Smith & Wesson box.

Around this same time, Terrell Police Officer Joe Hobbs heard a radio bulletin that

---

[2]      This is the offense upon which appellant was indicted.

a man suspected in earlier homicides was driving a white Ford Focus. While driving on Highway 80 in an unmarked police car, Hobbs saw a white Ford Focus outside Ali's Market. Hobbs called in the license plate number and confirmed that the Focus was the suspect's vehicle. Hobbs pulled into the parking lot and saw appellant standing by the store's counter. At this point, Hobbs was unaware that appellant had shot Carillo. Hobbs then observed appellant leave the store.

Hobbs called for backup, but before help could arrive, appellant drove away in the Focus. Hobbs followed appellant for a period of time during which appellant drove normally. However, when other officers joined Hobbs in following appellant and turned on their lights, appellant began driving erratically. Officers pursued appellant until he eventually stopped his vehicle, jumped out, and ran into a thickly-wooded area.

After about two-and-a-half hours of searching, officers located appellant in a creek bed. Appellant complied with police orders and was arrested about 1:30 a.m. He was charged with and ultimately convicted of capital murder for causing the death of Carillo during the course of a robbery. The judge, after applying the jury's answers to the special issues, sentenced Appellant to death. This appeal followed. Appellant raises nine points of error on appeal.

### I. Appellant's First Point of Error – Competency

In his first point of error, appellant contends that, after an initial competency trial in which he was found to be competent to stand trial, the trial court erred in failing to hold a

second competency trial.  We disagree.

Defense counsel filed a pre-trial motion challenging appellant's competency to stand trial.  Based on this motion, the trial court held a competency trial in September 2015 and determined that appellant was competent to stand trial.  In February and April 2016, counsel filed two additional pre-trial motions for an examination of appellant's competency.  They later re-urged the issue of appellant's incompetency during trial when appellant elected—against counsel's advice—to testify on his own behalf.  The trial court denied each of these requests for additional consideration of appellant's competency.

Appellant does not challenge the trial court's initial finding of competency.  Instead, he contends that, following the initial competency trial, his mental status further deteriorated such that he was subsequently rendered incompetent.  He argues that the trial judge was required to hold a second formal competency trial based on additional evidence that came to light after the original competency trial that suggested a material change in his mental status.  After reviewing the relevant portions of the record, we conclude that the evidence fails to show any material change in appellant's mental status. Thus, the trial court did not abuse its discretion in declining to hold a second competency trial.

**A.      September 2015 Competency Trial**

Five mental-health-expert witnesses testified at appellant's competency trial.  Three of those witnesses (Drs. Jolie Brams, John Fabian, and Douglas Tucker) testified for the defense.  One (Dr. Michael Arambula) testified for the State.  The remaining expert (Dr.

Michael Pittman) was court-appointed. We briefly summarize their testimony below.

The defense experts testified that appellant reported having significant delusions as well as auditory and visual hallucinations. They also observed that appellant expressed his belief that computer programs were controlling him, among other conspiracies. Brams, for example, noted that appellant believed he was being "controlled by hacking and implants" and was "the victim of a wide range of scientific experiments." She noted appellant's belief that his attorneys were "hacked" and that the Bible or the government controlled his attorneys' actions. Fabian similarly testified that appellant was "fixed and obsessed and perseverated" on the same delusions and paranoia that Brams had described. Appellant told Fabian that he heard voices, and he also reported visual and tactile hallucinations. Finally, Tucker testified that appellant was severely psychotic and was preoccupied with a variety of interwoven delusions and hallucinations. Tucker noted that appellant's attorneys expressed their inability to effectively communicate with appellant due to these delusions, and appellant's insistence that he had an "implant" in his knee and that computers were remotely controlling him. Based on this type of evidence, all three defense experts concluded that appellant lacked the ability to rationally understand the proceedings and was thus incompetent to stand trial.

Court-appointed expert Pittman and State's expert Arambula reached the opposite conclusion from the defense experts, testifying that appellant had demonstrated his understanding of the proceedings against him and was competent to stand trial. Pittman also

opined that appellant was embellishing or exaggerating his mental problems. Pittman noted that, in spite of his claimed delusions, appellant did not have the disordered thought processes or unusual affect that is associated with psychotic illness. Further, appellant claimed to experience auditory hallucinations in only one ear, but auditory hallucinations are usually bilateral. Pittman also noted that people with genuine mental problems are reticent to discuss them, but appellant seemed to draw attention to them. Appellant also claimed hallucinations in all five senses, which Pittman stated is rarely if ever seen in the truly mentally ill.

Pittman further noted that appellant was "often untruthful." In support, Pittman cited appellant's varying accounts of the murders which ranged from not committing them, to being blacked out, to being "controlled" to commit them. Pittman also observed that a Texas prison clinician thought appellant was malingering a psychosis in June 2011.[3]

Following this testimony and after briefing from both parties, on October 5, 2015, the trial court denied appellant's motion and found him competent to stand trial.

### B.     Evaluation by Dr. Lisa Clayton

In December 2015, the trial court appointed Lisa Clayton, a forensic and general psychiatrist, to assess whether appellant was legally insane at the time of the murders,

---

[3]     Notably, Brams also testified that she administered the Structured Inventory of Malingered Symptomatology (SIMS) to appellant and he obtained a score of 27, which was "considerably above the malingering cutoff" score of 14. Although Brams admitted that this concerned her, she ultimately opined that appellant was nevertheless incompetent due to his "real significant confusion about the world around him and significant cognitive deficits."

whether he currently suffered from mental illness and was in need of court-ordered mental health services, and whether he was intellectually disabled.[4] Pertinent to the issue before us, Clayton concluded that appellant suffered from attenuated psychosis syndrome, had antisocial personality disorder, and was malingering.

Appellant appropriately described to Clayton his current legal situation, the trial process, and what had transpired in the courtroom to date. He often talked about his numerology, the Bible, and being programmed, but each time Clayton was able to redirect him to answer her questions appropriately. Appellant described the murders in extensive detail. Clayton noted that, although appellant may have "somewhat" come to believe that a computer programmed him to commit the murders, "he would slip back into telling the truth about his motivations and actions" during the murders.

Clayton opined that appellant had developed a "fantasy escape world" in which he was not culpable for any of his bad actions. Clayton believed that on some level appellant knew that his fantasies were not true, but that it was easier for him to spend time in the fantasy world than face reality.

Clayton further concluded that appellant did not have a genuine disorder. She

---

[4] The trial court's order appointing Clayton indicates that she was appointed primarily for the purpose of examining appellant with regard to his intent to raise an insanity defense. *See* Art. 46C.101 (providing that, if defendant files notice to raise insanity defense, "the court may, on its own motion or motion by the defendant, the defendant's counsel, or the attorney representing the state, appoint one or more disinterested experts to: (1) examine the defendant with regard to the insanity defense; and (2) testify as to the issue of insanity at any trial or hearing involving that issue.").

explained that, when appellant was calm and comfortable, it was possible to redirect him to where he could speak in a normal, reality-based manner. Clayton believed that appellant's fantasy world was a volitional, primitive defense mechanism for him to deal with his current situation.

Clayton ultimately opined that appellant met the criteria for a diagnosis of malingering. Specifically, Clayton asserted that appellant was exaggerating the extent of his fantasy world, how it controlled him at the time of the murders, and how it then affected him. She also reported that appellant asked her several times, "Are you going to help me get the insanity defense?" She concluded that appellant was currently malingering by exaggerating his psychotic symptoms and feigning a severe mental illness in order to receive a secondary gain of a possible verdict of not guilty by reason of insanity.

### C.    Appellant's Second Pre-Trial Motion Suggesting Incompetency

On February 1, 2016, when individual voir dire was scheduled to begin, defense counsel filed a "Second Motion Suggesting Incompetency." Counsel alleged that new incidents had occurred and asserted that these incidents showed that appellant's "mental status [had] deteriorated." However, several of the alleged "new incidents" took place during the same time frame as Clayton's evaluation of appellant.

Defense counsel alleged that appellant had developed additional delusions that "the program" (which appellant had previously described as computers that remotely controlled him) was now seeking justice for him instead of trying to kill him. Therefore, appellant did

not feel a need to work with counsel or his mitigation team. Counsel alleged that appellant was only able to discuss with them "the program," his numerology, the Holy Bible being his life story, and what was going to happen to him when he was released from jail. Counsel argued that because of the increase in duration and occurrence of appellant's delusions, it was nearly impossible for appellant to rationally understand the proceedings and to consult with his legal team with a reasonable degree of understanding.

Following a hearing on the motion, the trial court took judicial notice of the earlier competency trial that it had presided over and of Clayton's report. The trial court noted that Clayton had gone into "great detail" about appellant's mental abilities, including his ability to understand legal concepts, to focus on his circumstances, and to answer questions appropriately. The trial court did not find any credible evidence suggesting appellant was incompetent.

### D.    Appellant's Third Pre-Trial Motion Suggesting Incompetency

On April 15, 2016, defense counsel filed a "Third Motion Suggesting Incompetency." The court heard the motion on April 18, 2016, two days before appellant's trial was set to begin. Counsel alleged that since the trial court's last ruling on competency, appellant's mental status had further deteriorated to the extent that he was now incompetent to stand trial.

The entire defense team observed that appellant "continue[d] to exhibit paranoid and delusional thinking, centering on the idea that he and his life are being controlled by a

complex network of programs." Counsel further asserted that appellant's delusional framework made it impossible to communicate with him in a meaningful manner, and his delusions clouded his ability to discuss his case and make important decisions. Counsel alleged that the delusions were increasing in severity.

Counsel gave several examples of how appellant acted during voir dire, such as: randomly laughing at inappropriate times; tapping his ear like he was hearing things; talking to himself; making strange motions with his hands; and continuously making strange facial expressions. In addition, appellant wanted counsel to question prospective jurors regarding certain Bible verses, and he did not understand whether a juror was favorable to him or not. According to counsel, appellant believed that once any juror heard his side of the story, he would be set free. Although clearly against his best interest, Appellant also continued to send correspondence to the District Attorney and to the trial court, and continued to discuss his case with jail staff. Counsel suggested that appellant's insistence that he was being controlled by computer programs was a result of his mental illness. The trial court left this motion pending.

### E.     Appellant's Re-urging of Incompetency During Trial

Appellant's trial began on April 20, 2016. On April 26, 2016, immediately after the trial court admonished appellant about his decision to testify, defense counsel re-urged for the fourth time that appellant was incompetent. Following a hearing outside the jury's presence, the trial court ruled that appellant was competent to stand trial. The trial court explained that its determination of competency was based upon its interchange with appellant

during the hearing, the previous competency trial, and Clayton's report.

###### F. Law and Application

A person is incompetent to stand trial if he does not have: (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, or (2) a rational as well as factual understanding of the proceedings against him. Art. 46B.003(a). A person is presumed competent to stand trial—and shall be found competent to stand trial—unless proven incompetent by a preponderance of the evidence. Art. 46B.003(b).

If the trial court or either party suggests that a defendant may be incompetent, the court "shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." Art. 46B.004(c). If, after an informal inquiry, the trial court determines that evidence exists to support a finding of incompetency, the court shall order an examination to determine whether the defendant is incompetent to stand trial. Art. 46B.005(a). The trial court shall then hold a separate trial to determine whether the defendant is incompetent to stand trial on the criminal offense. Art. 46B.005(b); *see also Turner v. State*, 422 S.W.3d 676, 692-93 (Tex. Crim. App. 2013). If the formal competency trial results in a finding of competency, the trial court is not obliged to revisit the issue later absent a material change of circumstances suggesting that the defendant's mental status has deteriorated. *Turner,* 422 S.W.3d at 693.

An appellate court reviews a trial court's decision not to hold a second competency trial for an abuse of discretion. *See Mines v. State*, 852 S.W.2d 941, 947 (Tex. Crim. App. 1992), *vacated and remanded on other grounds,* 510 U.S. 802 (1993) (applying abuse of

discretion standard). Therefore, we must determine if the trial court abused its discretion when it found there was no material change in circumstances suggesting that appellant's mental status had deteriorated each time he requested a new competency trial.[5]

In the September 2015 competency trial, the trial court heard extensive evidence from five experts regarding appellant's purported delusions and paranoia. The trial court found appellant's evidence unpersuasive, thereby relying on the opposing view that appellant was malingering. The trial court subsequently received evidence from Clayton confirming the view that appellant was malingering. In the subsequent motions suggesting incompetency, counsel alleged that appellant's mental status had deteriorated because his delusions had grown worse. For example, counsel alleged that appellant's trust in the "program" over his attorneys' opinions was a new circumstance. But the trial court had already considered and rejected similar evidence during the competency trial. Nothing about counsel's new assertions in this regard undermined the experts' prior conclusions that appellant was malingering.

The only "new" behavior presented was that appellant laughed inappropriately, stood, and talked to himself or others during trial. We have previously held that this type of inappropriate behavior, without more, is not evidence of incompetence. *See Moore v. State*, 999 S.W.2d 385, 395 (Tex. Crim. App. 1999) (holding that "[i]f such actions were probative

---

[5]     We note that the trial court did not explicitly rule on appellant's "Third Motion Suggesting Incompetency." However, the motion was implicitly overruled when the trial court denied appellant's final request during trial.

of incompetence, one could effectively avoid criminal justice through immature behavior"). We further note that this behavior is consistent with Clayton's opinion that appellant was malingering psychotic symptoms in an attempt to support an insanity defense.

Because appellant failed to show that there was a material change in circumstances following the initial competency proceeding suggesting that his mental status had deteriorated, the trial court did not abuse its discretion in declining to hold a second competency trial. Appellant's first point of error is overruled.

## II.    Appellant's Second Point of Error – Lesser-Included Offense

In his second point of error, appellant contends that the trial court erred by refusing to charge the jury on the lesser-included offense of murder, in violation of his due process rights under the Sixth and Fourteenth Amendments to the United States Constitution. Appellant objected to the charge's failure to include the instruction. The State responded that there was no evidence that appellant was guilty only of the lesser-included offense. When the trial court asked the defense if they could point to any evidence supporting a murder charge, defense counsel replied, "Your Honor, I'll rest on my argument so far." The trial court overruled the objection.

To determine whether a charge on a lesser-included offense should be submitted to the jury, we apply a two-step test. *See Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016). First, the offense must actually be a lesser-included offense of the offense charged, which is a matter of law. *Id.*; *see* Art. 37.09(1) (providing that an offense is a lesser-included offense if it is established by proof of the same or less than all the facts

required to establish the commission of the charged offense). Murder is a lesser-included offense of capital murder. *See Feldman v. State*, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002). Thus, appellant satisfies the first step.

Second, the record must contain some evidence that would permit a rational jury to find that if the defendant is guilty, he is guilty only of the lesser offense. *Bullock*, 509 S.W.3d at 925; *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007). Although anything more than a scintilla of evidence may be sufficient to entitle a defendant to a charge on the lesser offense, the evidence must establish that the lesser-included offense is a valid, rational alternative to the charged offense. *Bullock*, 509 S.W.3d at 925. We consider the entire record; "a statement made by the defendant cannot be plucked out of the record and examined in a vacuum." *Id.* (citing *Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000)); *see also Ramos v. State*, 865 S.W.2d 463, 465 (Tex. Crim. App. 1993). We do not, however, consider the credibility of the evidence and whether it conflicts with other evidence or is controverted. *Bullock*, 509 S.W.3d at 925.

Here, appellant was convicted of capital murder in the course of robbery. Where a capital murder defendant requests a charge on the lesser-included offense of murder based upon a dispute about the offense that aggravates the murder to capital murder, the record must show "some evidence which negates the aggravating element[.]" *Wolfe v. State*, 917 S.W.2d 270, 278 (Tex. Crim. App. 1996) (citing *Robertson v. State*, 871 S.W.2d 701, 706-07 (Tex. Crim. App. 1993)). Alternatively, the record must show that "the evidence of such aggravating element is so weak that a rational jury might interpret it in such a way as to give

it no probative value." *Id.* We review the trial court's determination of the second step for an abuse of discretion. *Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004).

In support of his claim on appeal, appellant argues that his own testimony provides evidence that the store surveillance video did not accurately reflect what occurred on the night of October 28, 2013.[6] He also notes that, although he admitted shooting Carillo, he denied that it was during the commission of a robbery:

A.      – At the store I only said one thing. I just said, I told them I got to go get my money. I said – I did like that I mean.

Q.      You got to speak in the microphone.

A.      I told him. I look for my credit card, and I forgot my credit cards. I had three credit cards on my side pockets, pockets right here. Then you got the pockets on the side by your knee. I forgot they were down there, and I was looking for them. So I guess somebody running programs or whatever, however they were, once that card, I tried to look for them, and next thing I know I reached for the – I grab the pistol.

Q.      Okay.

A.      But when I went in the store, the original way that happened, I went in the store, and I asked – I told them I'm going to the car to get, to get my credit card. When I came back, when I shot, Carillo boy, he was sitting on the stool, why that stool is knocked over. He was sitting on that stool on the cell phone. I shot one time. I shot one time, he fell off the stool. So the stool was right here. The body was on this side. But Ali must have got that ready for the video. So probably somebody program Ali to get that ready for the video. So they tried to program it like it was a robbery, **but it wasn't no robbery**. So that's why they

---

[6]      The evidence shows that the offense was captured on video by the sixteen cameras comprising the convenience store's video surveillance system and that the system was working properly on the night of the offense. The State introduced both the flash-drive showing the video from all sixteen screens and a CD of video footage pieced together from the sixteen cameras to show appellant's movements through the store.

programmed him. Somebody made a, made a video. They good. I seen that. They good. They did a good job. But somebody programmed him to be right there by the cash register, so when I came in, they show the guy get shot.

Q.      Hold on. I didn't understand that.

A.      I said I shot him, like when I took a shot, he was on the stool right there.

Q.      Okay. So you —

A.      But they run a program; and they tweaked, somebody tweaked that, that video, as you can see when you watch it, it switches up every time because they got mental health, try to – they going in mental health, they probably can fix that video. You can tweak that video, you probably can tweak that video to make it from where he's at the cash register to where he was on that stool.

Q.      Now [appellant], are you saying that what actually happened the night you went to Ali's is different than what happened on the video?

A.      Yes, it's, it's way off.

(Emphasis added).

Viewed in isolation, appellant's blanket denial that he committed robbery might at first glance be construed as a "scintilla of evidence" to support the lesser-included instruction. However, the law requires that the evidence must establish that the lesser-included offense is a "valid, rational alternative to the charged offense" when considered in the context of the entire record—the evidence may not be considered in a vacuum. *See Bullock*, 509 S.W.3d at 925.

When viewing the entire record in this case, appellant's blanket denial does not meet the second step of the test for lesser-included offense instructions. First, at other points in

his testimony, appellant admitted that he knew he needed to pay for the beer. He agreed that if he could have found his credit cards, he would not have shot Carillo. He further agreed that, in addition to taking the beer, he wiped down the door to remove fingerprints, he attempted to get money from the register, and he took Carillo's gun from behind the counter after stepping over Carillo's body.

Second, appellant's statement that it was not a robbery must be viewed in light of his defensive theory of the case. *Ramos*, 865 S.W.2d at 465; *Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986). The record shows that appellant's theory was that, although he was guilty of committing the capital murder, he was insane at the time of the offense and not liable for his actions. The function of appellant's testimony was not to show that he did not commit the robbery, but was to show that he was insane because he believed that computer programs caused the store owner to arrange the victim and the surroundings to make it look like a robbery. This was not affirmative evidence that would permit a jury to rationally conclude that appellant was guilty only of murder. *See Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012) (requiring affirmative evidence of the lesser-included offense, not mere speculation). Accordingly, the record does not contain "some evidence" that would permit a rational jury to find that appellant did not commit the aggravating offense of robbery, nor was the evidence of robbery so weak that a rational jury might give it no probative value. *See Wolfe*, 917 S.W.2d at 278; *see also* TEX. PENAL CODE § 29.02. Therefore, the trial court did not abuse its discretion by refusing to instruct the jury on the lesser-included offense of murder. Appellant's second point of error is overruled.

### III. Appellant's Third and Fourth Points of Error – Intellectual Disability

Appellant argues in his third point of error that the evidence is sufficient to show he is ineligible for the death penalty because he is intellectually disabled under the standard recently articulated by the Supreme Court in *Moore I*, 137 S. Ct. 1039. The Supreme Court interprets the Eighth Amendment as prohibiting the execution of an intellectually disabled individual because the punishment is cruel and unusual. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). The decision regarding whether an individual is intellectually disabled rests with the trier of fact. *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006); *see also* TEX. CODE CRIM. PROC. art. 36.13 (providing generally that "the jury is the exclusive judge of the facts").

Appellant asserts that the jury, as the fact finder, improperly assessed his claim of intellectual disability under the standard set forth in *Ex parte Briseno,* 135 S.W.3d at 7-9. He argues that, applying the legally correct framework from *Moore I* to the facts of his case, the evidence was sufficient to show that he is intellectually disabled. Therefore, he contends that this Court should vacate his death sentence and reform his punishment to life imprisonment.

Alternatively, in point of error four, appellant contends that the trial court committed reversible error by limiting his presentation of evidence and arguments on intellectual disability to the factors set forth in *Briseno* in violation of his Eighth and Fourteenth Amendment rights. Specifically, appellant contends that the trial court required the mental-

health experts at trial to tailor their testimony to the *Briseno* standard, and disallowed some of the experts' testimony regarding the current medical framework. Appellant also notes that the trial court, in front of the jury, repeatedly emphasized to the attorneys and experts that *Briseno*, rather than the current medical diagnostic framework, was the proper standard for evaluating intellectual disability in Texas, thereby preventing appellant from arguing that he was intellectually disabled under current medical standards. Thus, due to the pervasive influence of *Briseno* throughout the punishment phase proceedings, appellant argues that he is entitled to a new trial on punishment.

After reviewing the relevant law and evidence in the record, we explain our conclusion sustaining appellant's fourth point of error and declining to reach the merits of this third point of error.

### A.    *Ex parte Moore* and *Moore v. Texas*

At the time of appellant's 2016 trial, the State and trial court followed this Court's holding in *Ex parte Moore*, 470 S.W.3d 481 (Tex. Crim. App. 2015) ("*Ex parte Moore I*"), with regard to appellant's intellectual disability claim. In *Ex parte Moore I*, we held that Texas courts should continue to follow the definition of intellectual disability as set out in this Court's 2004 decision in *Briseno*, 135 S.W.3d at 7-9, rather than apply the newer medical/clinical standards defining intellectual disability. *Id*. at 486-87. One year later, the United States Supreme Court decided *Moore v. Texas,* 137 S. Ct. 1039, 1044 (2017) ("*Moore I*"), wherein it vacated our holding in *Ex parte Moore I* and remanded the case to this Court to reassess Moore's claim of intellectual disability using the medical community's newer

diagnostic framework. *See* 137 S. Ct. at 1053 (citing the standards set out by the DSM-5[7]

and the AAIDD[8]). The Supreme Court specifically criticized *Ex parte Moore I*'s use of the

*Briseno* factors to analyze Moore's adaptive functioning. *Id.* at 1051-52.

In *Briseno*, we held that adaptive behavior criteria are exceedingly subjective, but that

factfinders could focus upon additional evidentiary factors in weighing evidence as indicative

of intellectual disability.[9] *Briseno*, 135 S.W.3d at 8-9. The Supreme Court in *Moore I*

rejected this approach, reasoning that the *Briseno* factors deviated from newer and preferred

---

[7]      American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF
DISORDERS, 5th ed. (2013) ("DSM-5").

[8]      American Association on Intellectual and Developmental Disabilities, 11th ed. (2010)
("AAIDD").

[9]      The *Briseno* factors included:

1.      Did those who knew the person best during the developmental stage – his family, friends,
teachers, employers, authorities – think he was intellectually disabled at that time, and, if
so, act in accordance with that determination?

2.      Has the person formulated plans and carried them through or is his conduct impulsive?

3.      Does his conduct show leadership or does it show that he is led around by others?

4.      Is his conduct in response to external stimuli rational and appropriate, regardless of
whether it is socially acceptable?

5.      Does he respond coherently, rationally, and on point to oral or written questions or do his
responses wander from subject to subject?

6.      Can the person hide facts or lie effectively in his own or others' interests?

7.      Putting aside any heinousness or gruesomeness surrounding the capital offense, did the
commission of that offense require forethought, planning, and complex execution of
purpose?

*Briseno*, 135 S.W.3d at 8-9.

clinical standards for evaluating intellectual disability. *See Moore I*, 137 S. Ct. at 1051-52

(reasoning that "[t]he CCA's attachment to the seven *Briseno* evidentiary factors further

impeded its assessment of Moore's adaptive functioning"). The Supreme Court noted that

the *Briseno* factors improperly advanced lay perceptions of intellectual disability and

overemphasized evidence of a defendant's perceived adaptive strengths. *Id*. By contrast, the

Supreme Court stated, the medical community focuses on a defendant's adaptive deficits as

opposed to his adaptative strengths, and requires that deficits need be shown in only one of

the three adaptive domains: social, conceptual, or practical. *Id*. at 1050. Given its

determination that this Court's analysis was flawed because of its adherence to the *Briseno*

standard, the Supreme Court vacated this Court's decision and remanded the case for further

proceedings. *Id.* at 1053.

In 2018, we issued a revised opinion in *Ex parte Moore* wherein we re-evaluated the

appropriate framework for assessing a capital defendant's claim of intellectual disability.

548 S.W.3d 552 (Tex. Crim. App. 2018) ("*Ex parte Moore II*"). We abandoned reliance on

the *Briseno* factors and adopted the current medical standard set forth in the DSM-5. *Id*. at

559-61. Applying this standard to the facts of Moore's case, we held that Moore had

nevertheless failed to establish that he was intellectually disabled. *Id.* at 573. The Supreme

Court subsequently reversed this decision in 2019. *Moore v. Texas*, 139 S. Ct. 666 (2019)

("*Moore II*").

In *Moore II*, the Supreme Court held that this Court in *Ex parte Moore II* continued

to implicitly rely on the *Briseno* factors in again reaching the conclusion that Moore was not

intellectually disabled. *Moore II*, 139 S. Ct. at 670. The Supreme Court criticized this Court's continued focus on a defendant's adaptive strengths over his adaptive deficits, especially strengths developed or demonstrated in prison. *Id*. at 669-71. The Supreme Court also criticized *Ex parte Moore II*'s reliance on "lay stereotypes of the intellectually disabled." *Id*. at 672. The Supreme Court ultimately concluded that, properly applying the preferred medical standards, Moore had shown that he was a person with intellectual disability. *Id*. Following a second remand from the Supreme Court, this Court implemented the Supreme Court's holding by reforming Moore's punishment to life imprisonment. *Ex parte Moore,* 587 S.W.3d 787, 789 (Tex. Crim. App. 2019).

**B.      Intellectual Disability and Adaptive Functioning under the DSM-5**

Following the Supreme Court's decisions in *Moore I* and *Moore II*, any evaluation of a claim of intellectual disability by a capital defendant must be adequately informed by, and may not substantially deviate from, the Supreme Court's preferred medical framework. In our decision in *Ex parte Moore II*, we explained that we would implement the Supreme Court's holding by following those preferred medical guidelines as set forth in the DSM-5. 548 S.W.3d at 559-61.

The DSM-5 defines "intellectual disability" (also referred to as intellectual developmental disorder) as:

> a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. The following three criteria must be met:

A. Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing ("Criterion A").

B. Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community ("Criterion B").

C. Onset of intellectual and adaptive deficits during the developmental period ("Criterion C").

DSM-5 at 33.

"The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions." *Id*. at 37. The DSM-5 further explains the adaptive functioning criteria in more detail:

Deficits in adaptive functioning (Criterion B) refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual* (*academic*) *domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities, and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures. Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible. Additional sources of information include educational, developmental, medical, and mental health evaluations. Scores from standardized measures and interview sources must be interpreted using clinical judgment. When standardized testing is difficult or impossible, because of a variety of factors (e.g., sensory impairment, severe problem behavior), the individual may be diagnosed with unspecified intellectual disability. Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.

*Id*. at 37-38. The DSM-5 continues:

Criterion B is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A. Criterion C, onset during the developmental period, refers to recognition that intellectual and adaptive deficits are present during childhood or adolescence.

*Id*. at 38.

### C.    Analysis

The punishment phase jury charge included the following "Special Issue No. 1":

Do you find by a preponderance of the evidence that [appellant] is a person with mental retardation/intellectual disability?

To aid the jury in answering this special issue, the jury charge further instructed:

In deliberating on your answer to Special Issue No. 1, you are instructed that [appellant] has the burden of proving by a preponderance of the evidence that Special Issue No. 1 should be answered "Yes." "Preponderance of the evidence" means the greater weight of the credible evidence.

"Mental retardation" which is also called "intellectual disability," is a disability characterized by: (1) significantly sub-average general intellectual functioning, generally shown by an intelligence quotient (IQ) of 70 or less; (2) which is accompanied by related and significant limitations in adaptive functioning; (3) the onset of the above two characteristics occurred before the age of 18.

"Significantly sub-average general intellectual functioning" refers to measured intelligence on standardized psychometric instruments of approximately two or more standard deviations below the group mean for the tests used. Significantly sub-average intellectual functioning is generally evidenced by an IQ score of approximately 70 or below. An IQ score is not considered to be a fixed number. Instead, a score represents a range or an approximation of a person's IQ.

The jury answered Special Issue No. 1 "no," finding that appellant was not a person with intellectual disability.[10]

With regard to appellant's fourth point of error, the overall issue we must address is whether appellant's constitutional rights were violated due to the jury's use of the standard from *Briseno*, rather than the framework mandated by the United States Supreme Court, to assess appellant's claim of intellectual disability. We find that because the trial court informed the jury that *Briseno* was the law in Texas and required the experts to tailor their testimony to that standard, this resulted in the jury improperly relying solely on the *Briseno* standard. Based on the Supreme Court's *Moore I* and *II* decisions, such reliance on the *Briseno* standard amounted to constitutional error. We further conclude that, given the

---

[10] The record shows that appellant filed objections to the jury charge regarding the issue of intellectual disability, including objections that the charge did not instruct the jurors to disregard lay opinions regarding whether appellant was intellectually disabled and also failed to instruct that the defendant did not have to prove whether any intellectual disability is unrelated to a personality disorder.

circumstances of this case, the error was not harmless beyond a reasonable doubt. Therefore, we must hold that appellant is entitled to a new punishment hearing. We review the relevant evidence below before explaining this conclusion in greater detail.

### 1. Evidence Presented to the Jury Regarding Intellectual Disability

Five expert witnesses testified regarding intellectual disability during appellant's punishment trial. Appellant's experts included: Dr. Dan Reschly, a school psychologist and intellectual disability expert; Dr. John Fabian, a forensic and clinical psychologist and neuropsychologist; and Dr. Doug Tucker, a psychiatrist. The State's experts were: Dr. Randall Price, a forensic psychologist and neuropsychologist; and Dr. Lisa Clayton, a forensic psychiatrist.

### a. Reschly

At Reschly's *Daubert*[11] hearing, the State challenged the doctor's demonstrative slides that defined intellectual disability based upon *Atkins, Hall v. Florida*,[12] the DSM-5, and the AAIDD. The State argued that those definitions did not represent Texas law and that Reschly had to present his findings under *Briseno*. The trial court agreed that *Briseno*, rather than *Atkins* and *Hall*, was the controlling standard for intellectual disability in Texas. The trial court ruled that using the *Atkins* or *Hall* standards would mislead the jury and violate Texas Rule of Evidence 403.

---

[11]     *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-91 (1993).

[12]     134 S. Ct. 1986, 1993 (2014) (stating, in a pre-*Moore I* case, that in determining intellectual disability, "it is proper to consult the medical community's opinions").

Over defense objections, the trial court required Reschly to edit his presentation to specifically address the *Briseno* factors and remove the slides referring to *Atkins* and *Hall*. Although Reschly was allowed to compare the DSM-5 and AAIDD to Texas law, the trial court instructed Reschly that he could not represent either of those standards as Texas law. The trial court also specifically instructed Reschly not to represent as Texas law the DSM-5 and AAIDD's requirement that adaptive deficits need only be shown in one domain of adaptive behavior. The trial court reiterated that Reschly was to cite to the *Briseno* test.

Reschly testified before the jury that he consults nationally as an expert in cases involving mild intellectual disability and special education. He testified that Texas's legal definition of intellectual disability was from a court case called *Briseno* that was based on standards that he believed were from 2004 or 2005. He noted that, under *Briseno*, any limitations in adaptive behavior had to be related to the limitation in intellectual functioning and that the *Briseno* factors were very subjective. However, regardless of which standard was used, Reschly concluded that appellant is intellectually disabled.

Reschly reported that appellant scored a 67 on the Weschler Adult Intelligence Scale (WAIS) administered by Fabian, and scored a 70 on the same test administered by Price less than three months later.[13] Based upon available school records, Reschly testified that appellant's mental deficiencies began before the age of 18.

---

[13]     Evidence showed that most of appellant's school records had been destroyed by the Terrell school district after seven years per the district's policy; therefore, the experts in this case had no historical intelligence-test data upon which to rely. Fabian and Price each administered the WAIS tests during their individual evaluations of appellant for the instant case.

Reschly also testified that, based on his own evaluation of appellant and information supplied by other experts, he identified significant deficits in appellant's adaptive behavior that occurred during appellant's childhood, his adolescence, and in his adulthood. Reschly found these deficits in three areas: conceptual, social, and practical. The Vineland adaptive behavior test revealed appellant's "very low" composite score of 62. Reschly testified that 99% of the population would score higher in all three areas of adaptive behaviors on that test.

Regarding appellant's conceptual deficits, Reschly focused on appellant's lack of literacy skills, his educational record showing he was markedly behind his peers, and his lack of mathematics skills. Reschly stated that these low academic abilities appeared as early as appellant's first grade records (second percentile in reading, fifth percentile in math). He further noted that, although appellant was not held back in first grade (against teacher recommendation), he was eventually held back at some point because he did not graduate high school until he was 19 years, 7 months old.

Appellant's existing school records showed that he was in special education classes and that in tenth grade he failed the reading, writing, and math mastery tests. He was exempted, through a special education committee, from having to retake those exams that he failed. Although he also failed the biology mastery exam in tenth grade, he did eventually pass that exam after having to repeat the course in eleventh grade. Overall, appellant's high school transcript showed that he had low-to-failing grades in most academic subjects. Despite this, having been exempted from several requirements for graduation, appellant did graduate from high school. Reschly also noted that appellant had recently scored below a

second-grade level in reading fluency and comprehension on the Woodcock-Johnson test administered by defense expert Fabian. Further, Reschly asserted that appellant had large adaptive deficits regarding money, time, and number concepts.

Reschly testified that the conceptual domain relates to the *Briseno* factor that asks whether the defendant "responds coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject." He noted that he often had to redirect appellant when interviewing him. Reschly asserted that it was "very hard to keep [appellant] on task and focused on what we were talking about."

Regarding appellant's social domain deficits, Reschly opined that appellant had significant deficits across all areas. He explained that several people with whom he spoke described appellant as a follower and as being easily influenced by others. He testified that these social domain deficits also relate to the Texas-specific *Briseno* factors. As an example, Reschly explained that a neighbor told him that appellant did not interact normally with other children.

Reschly testified that self-esteem is another aspect of the social domain and that appellant had a negative self-concept—he rarely initiated social contacts on his own and other students often teased him. Reschly believed appellant used drugs to cope with his poor problem-solving skills and his inability to understand complex relationships.

According to Reschly, the lack of problem-solving skills is related to the *Briseno* factors. He stated that appellant exhibited impulsive conduct. As an example, Reschly noted that having at least eight different auto accidents and repeated incarcerations showed that

appellant failed to consider the consequences of his behavior. Reschly further noted that appellant had no plans to support himself or to avoid legal violations; appellant could not make rational plans to keep himself out of trouble.

He further opined that other *Briseno* factors fell under the social domain as well. Reschly noted that appellant engaged in multiple socially unacceptable behaviors and did not learn from experience. He cited behaviors such as appellant's repeated relationships with underage girls and his irrational reactions to being charged with crimes and being incarcerated. Reschly further noted that appellant was gullible, naive, and vulnerable. For example, appellant admitted to being cheated in financial transactions, having irrational fears that his mother was trying to poison him, and believing that other family members were conspiring against him. In addition, Reschly testified that appellant had problems following rules or obeying orders.

Further referencing the *Briseno* factors, Reschly opined that appellant's efforts to lie were "terribly ineffective." He noted that appellant could not effectively hide his criminal behavior and was easily apprehended after his offenses. In addition, Reschly noted that appellant showed no foresight because he eliminated his principal source of support when he killed his mother. He also had no effective plan to escape apprehension or punishment. Reschly said that appellant's decisions were irrational with no "instrumental purpose."

Regarding the practical domain, Reschly noted that appellant had never lived independently and had meager occupational skills. He stated that, even as an adult, appellant was dependent on his mother to handle the basic things in life including financial support,

paying utilities, and purchasing transportation. He further opined that appellant had difficulties functioning under a schedule or routine. Appellant was also chronically late and unreliable. When tested by Reschly, appellant was unable to locate a specific person's phone number in the phone book without assistance. Reschly stated that he tested appellant for malingering his intellectual disability and found no evidence to support a conclusion that appellant was malingering.

There was evidence that appellant had a history of mental health diagnoses and treatments. According to Reschly, however, persons "with intellectual disability are more likely to be 'comorbid,' that is have another mental illness simultaneous with or existing alongside of the intellectual disability." Thus, even if appellant met the criteria for another mental illness, that diagnosis would not preclude appellant from also being intellectually disabled.

On cross-examination, after establishing that Reschly was not licensed in Texas, the State asserted that the DSM-5 and AAIDD are only diagnostic tools and that their intellectual disability definitions did not apply because "the controlling [law] is the *Briseno* factors [in the] State of Texas." The State then had Reschly confirm that the jury could only use the *Briseno* test in determining whether appellant was intellectually disabled. The State further asked Reschly why the jury should not believe lay testimony that appellant was not intellectually disabled when he was young. Reschly responded that, in his opinion, the *Briseno* factors were too subjective, but the State responded by pointing out that Reschly was not licensed in Texas. The State argued that Reschly did not understand the *Briseno* factors

and, therefore, his interpretations were wrong. The State suggested that appellant was not intellectually disabled during the developmental period. Instead, it posited that appellant's use of methamphetamines and PCP-soaked marijuana was responsible for his recent IQ scores.

On re-direct, Reschly testified that appellant's academic performance and test results showing he was intellectually disabled at the ages of five, six, and seven could not have been caused by his subsequent use of illegal substances. Reschly reiterated that appellant's pervasive and severe deficits in school were more consistent with mild intellectual disability than with a specific learning disability.

### b. Fabian

Appellant's expert Fabian testified that he diagnosed appellant with the following: intellectual disability, mild; neurocognitive disorder; schizoaffective disorder, bipolar type; malingering (psychosis); other specified personality disorder with antisocial traits; alcohol use disorder; and methamphetamine disorder. Fabian stated that he relied on the DSM-5 and the AAIDD in making his determination of intellectual disability, and he based his findings on the records he reviewed, people he interviewed, and the time he spent with appellant. He believed appellant had "low cognitive functioning" as early as kindergarten, "before he started using methamphetamine." Fabian also cited evidence that appellant had a history of special education attendance and was a "resource student" during his school years.

When Fabian began to testify regarding how he determined that appellant was intellectually disabled, the State asked if he was "about to get into Texas law on ID or some

other law?" When Fabian responded, "Clinical," the State objected that "clinical" was irrelevant. The following then occurred before the jury:

THE COURT:      Doctor, do you know the *Briseno* factors?

[Fabian]:      I do. I would say, Your Honor, this is under U.S. Supreme Court law.

THE COURT:      Well, let me just say that even though we respect U.S. Supreme Court law here in Texas, we do have our own standard.

[Fabian]:      I'm, I'm aware of *Briseno*.

THE COURT:      And then I would like for you to focus on the *Briseno* factors if you will please. I'll let you talk about the other, but just as Dr. Reschly, I want you to focus on the *Briseno* factors.

Fabian noted that all the tests use the same three prongs, but *Briseno* added factors to the adaptive-behavior prong. The trial court then stated that the law as set out in *Briseno* "is the applicable standard for assessing [intellectual disability]." The court continued, "[I]f you [Fabian] want to talk about DSM-5 and AAIDD, I'll let you do that; but I don't want the jury to be misled as to what standard applies to this case." Fabian agreed to follow *Briseno*.

Fabian testified that he administered the WAIS, 4th Edition, to appellant. He reported that appellant's full scale IQ score was a 67, which he confirmed is in the "intellectual disabled mild range." He also testified that, when the State's expert administered another WAIS test a few months later, appellant scored a 70, which is still in the range of mild intellectual disability. Fabian further noted, due to the tests being so close together, that an increase of three points would be expected as a result of the "practice effect."

Fabian stated that appellant had deficits in all areas of "receptive, expressive language, vocabulary, fund of knowledge, [and] abstract reasoning." He considered appellant's kindergarten and first grade records to be particularly important. He explained that kindergarten and first grade are a critical time for language development and appellant's records indicated significant impairments during that time frame. Appellant's current diagnosis was consistent with records from his early elementary years showing weaknesses in auditory discrimination, letter sound correspondence, listening comprehension, reading, and math. Appellant's strength in visual discrimination had also been consistently low over the 30-year time span. Appellant registered in the 22nd percentile in first grade and was in the 10th percentile at the time of Fabian's examination. Fabian stated that appellant's deficits in adaptive behaviors had remained consistent as well.

Fabian also administered the Vineland test for adaptive functioning for which appellant obtained a composite score of 62. Fabian testified that any composite score of 70 or below is two standard deviations below the mean and demonstrates intellectual disability. He explained that the Vineland manual requires and supports the use of a collateral witness to determine adaptive functioning. Fabian interviewed Sonja Sphaler, appellant's former live-in girlfriend, as the collateral witness in scoring the Vineland test. In defending his use of Sphaler in this case, he noted that she had lived with appellant (and his mother) for three years and was familiar with his functioning close to the time of his arrest.

Fabian further testified that appellant was not malingering his intellectual disability. He explained that by using some cognitive effort tests as part of his assessment of appellant,

he could tell that appellant "put forth pretty good effort."

Fabian also noted that appellant took both a Premorbid Functioning test and the Beta-III test. He cautioned that neither test should be used in place of a full-scale IQ test. Fabian described the Premorbid Functioning test, on which appellant scored an 80, as a "word reading" test that was generally used to determine loss of intelligence following a head injury. But he stated that it could also possibly be used to determine the effects of methamphetamine use. The Beta-III test, on which appellant scored a 92, measured non-verbal intelligence, which only encompasses the perceptual reasoning part of a full-scale IQ test. Fabian asserted that these two tests played to appellant's strengths and failed to measure "the real domains of intelligence that concern attention, memory, vocabulary, and abstract reasoning skills."

Fabian testified that methamphetamine use alone could not give someone a 67 IQ. He also confirmed that intellectually disabled people are capable of getting a driver's license, driving a car, cooking, ironing, working, writing letters, and talking on the phone. He added that it may be difficult for someone without psychological experience to even recognize that a person was "intellectually disabled mild."

On cross-examination, the State again stressed the *Briseno* factors. Fabian agreed that appellant's actions of wiping his fingerprints from some items, burning his mother's home, throwing the gun away, fleeing, removing his red shirt, and hiding in water—even though most were done poorly—could be seen as signs of problem-solving ability and adaptability. Fabian noted that the State was only discussing "criminal adaptive behavior" and that those

things did not show that appellant was not intellectually disabled.

The State then pointed out that people who were around appellant growing up (some friends, family, and his biology teacher) and those around appellant in his adult years (prison authorities) said that appellant was not intellectually disabled. The State asserted that these people's opinions must be considered under *Briseno*. Fabian responded that those people were not experts, they performed no formal assessments, and only experts can make a determination of intellectual disability. Fabian conceded, however, that under *Briseno* the opinions of laypersons should be taken into consideration.

On re-direct, Fabian opined that many of appellant's actions during his crimes did not exhibit good problem solving, such as: failing to take the victim's money at the convenience store, leaving his handprint at the crime scene, and fleeing to a location near his home. He also acknowledged that there are similarities between people with intellectual disability and those with antisocial traits such as irresponsibility, problems following rules and laws, and impulsivity. However, after reviewing all of appellant's information and records, Fabian concluded appellant is "intellectually disabled but mild."

#### c. Tucker

Defense expert Tucker testified that he believed appellant was born with mild intellectual disability. He further opined that appellant did not suffer from antisocial personality disorder because that disorder must appear before age 15. Tucker noted that there was no evidence that appellant violated the basic rights of other people or violated major rules, either legally or socially, during his youth. He testified that someone can exhibit adult

antisocial behaviors based upon their environment, but when removed from that environment they will no longer be antisocial.

With regard to appellant's intellectual disability, Tucker described him as a "low functioning man." He stated that appellant did well in structured settings and in structured interactions with others. He testified that appellant was intellectually in the range of a seven- to ten-year-old child.

### d.    Price

State's expert Price testified that appellant's IQ score was significantly subaverage. However, after reviewing records and conducting collateral interviews with appellant's friends and family, Price determined that appellant did not meet the adaptive deficit prong for intellectual disability. Price also did not believe that appellant's problems with neurocognitive functioning and intelligence began in the developmental period. Instead, Price opined that they arose later in life "as a result of [appellant's] stimulant use disorder and the abuse of methamphetamine."

Regarding the "onset prior to 18" prong, Price testified that he relied on the prison screening that used the Beta-III IQ test, on which appellant scored a 92. This test was given after appellant was 18. Price also stated that he gave appellant a "test that would show me what his intelligence used to be before the drug abuse, and it was 89." Price further considered appellant's score of an 80 on the Premorbid Functioning test Fabian administered. Based on these tests, Price surmised that appellant had an IQ in the 80s prior to his drug abuse.

Regarding appellant's adaptive functioning, Price testified extensively about the *Briseno* factors. Price stated that the friends, family, and teachers he interviewed did not think that appellant was intellectually disabled. He relayed that those people thought appellant had learning problems and was "slow." They knew that appellant had been in special education, but they did not think appellant was "intellectually disabled." Price also stated that he heard from a teacher that appellant was in special education for learning disabilities and not for intellectual disability.

Because Price diagnosed appellant with antisocial personality disorder, he opined that appellant had a plan for his life that "was to live off other people and to not obtain or keep a job and to have other people support him because that's what he wanted to do." He emphasized the fact that appellant called an ex-girlfriend and asked if he could live with her after his mother insisted that he help support himself and pay for his own cell phone. Price asserted that it was appellant's plan to continue living his antisocial lifestyle.

Price noted that appellant was "not consistently called a follower," although he was known to be a shy, quiet loner when he was younger. Instead, according to appellant's cousin, it depended on "whose turf they were on." If appellant was in familiar surroundings, he was more likely to take the lead. Price also noted that some jailers described appellant as a "tank boss"—the leader of his pod in the jail. Thus, Price concluded that appellant was both a leader and a follower.

Price also noted that appellant had the capacity to respond appropriately to directions and when interacting with others. At other times, appellant decided not to respond

appropriately, especially when he was under the influence of drugs or alcohol.

Price stated that when appellant was given unstructured, open-ended questions, appellant rambled from topic to topic. But Price believed that this was "something he was feigning." Price said that if appellant was forced to answer a direct question, he answered responsively and coherently. Price testified that appellant responded appropriately to written questions.

Price noted that appellant could certainly lie. He opined that appellant had "fooled several of the experts" and even fooled some people into believing that he was mentally ill.

Price believed that appellant engaged in plan- and goal-directed behavior out of anger and a desire to obtain money and drugs. For example, appellant asked people for ammunition in the days leading up to the offense and he obtained a can of gasoline. Further, the convenience store video showed appellant going out to the car to get a gun and wiping his fingerprints off the door and cash register. However, Price conceded that some of appellant's behavior regarding the offense was impulsive. For example, the video also showed that appellant did not wipe all his fingerprints from the door and he left the can of beer that he had been holding. Overall, Price believed that appellant showed consistency in his planning and attempts to hide evidence even though his efforts were not always intelligent or thorough. Price stated that he believed appellant would not have killed his mother had he actually planned things through. But he asserted that appellant was angry and "a lot of people don't do their best thinking when they're angry."

Following his review of the *Briseno* factors, Price contrasted his overall review with

that of Reschly. Price stated that Reschly focused only on intellectual disability. Price, however, viewed how other kinds of mental problems (personality disorders, mental illness) affected appellant's intellectual abilities. Because appellant did poorly in school, Price opined that appellant had borderline intellectual functioning but stopped short of diagnosing him as intellectually disabled. He concluded that appellant had antisocial personality disorder, stimulant use disorder, and substance-abuse-induced mild neurocognitive disorder.

On cross-examination, the defense asked Price about the information he used to opine retroactively that appellant had a higher IQ prior to his methamphetamine use. Regarding the Beta-III test, Price acknowledged that it was only a screening test for non-verbal IQ and was not recommended as a replacement for more comprehensive measures of intelligence. He also admitted that he did not know if the person who administered the Beta-III was qualified to do so. Regarding the Premorbid Functioning and other "word reading" tests, Price conceded that someone like appellant, who had a strength in "sight reading," would have a higher score. He also acknowledged that appellant's visual discrimination scores from first grade were consistent with his scores on these word tests. Price admitted that the "practice effect" may have elevated appellant's scores on the tests that Price administered after appellant's experts had conducted their evaluations. He also testified that appellant was not faking or malingering his cognitive deficits.

### e.    Clayton

Court appointed-expert Clayton testified that she reviewed appellant's records and concluded that appellant was not intellectually disabled. Clayton admitted that she conducted

no tests related to intellectual disability, discounted both Fabian's and Price's testing of appellant, and was unfamiliar with the AAIDD. She observed that appellant could write and was able to use some three-to-four-syllable words. She also stated that when she listened to some of appellant's phone calls, he used what she considered to be abstract thinking. Based on those factors and her conversations with him, she determined that appellant was not intellectually disabled.

Clayton testified that she does not use standardized IQ testing because:

Again, in talking with someone, based upon my 22 years of experience, I think I can talk to someone in an evaluation type setting for, you know, an hour and assume, within probably 10 to 15 IQ points, what their IQ is, and then make a referral.

She further stated that she believed people with mild intellectual disabilities are usually unable to obtain driver's licenses, cannot buy or sell things, and do not know how to "Google" things or do "computer stuff."

### 2. Jury Argument Regarding Intellectual Disability

During closing arguments, the State reminded the jury that *Briseno* is the law in Texas and that the defense experts should be discredited because:

That's not Texas law. They want to talk about the AAIDD. They want to talk about all these other books. Because they don't want to talk about the law.

The State discussed the importance of lay opinion testimony in deciding whether appellant has adaptive deficits and argued that the jury should consider appellant's adaptive strengths. The State further stressed that, because appellant's behaviors matched antisocial personality disorder traits, appellant was not intellectually disabled.

The defense also spoke about the *Briseno* factors, but noted that some of the factors are less probative than others. Defense counsel stated that it was problematic to rely on lay opinions that are affected by common myths society holds about the intellectually disabled. Defense counsel stressed that mild intellectual disability looks different than severe intellectual disability and only those specifically trained can diagnose it.

### 3. Jury Note

During deliberations, the jury sent a note to the trial court which read: "We the jury need a copy of the Bresno [sic] factors please." The trial court responded with a note which read: "You have received all of the evidence and the law. I can instruct you no further. Please continue your deliberations."

With the above facts in mind, we now turn to appellant's claims on appeal.

### D. Under the Supreme Court's decisions in *Moore I* and *Moore II*, the jury was provided an improper diagnostic framework.

As detailed above, both parties presented the jury with extensive expert testimony about the intellectual disability issue. The jury charge instructed that "intellectual disability" is a disability characterized by: (1) significantly sub-average general intellectual functioning, generally shown by an intelligence quotient (IQ) of 70 or less; (2) which is accompanied by related and significant limitations in adaptive functioning; and (3) the onset of the above two characteristics occurred before the age of 18.

The framework for analyzing the first and third prongs of the intellectual disability test (measuring IQ and determining whether onset occurred before 18) was properly provided to

the jury consistent with the definitions set forth in the DSM-5.  *See* DSM-5 at 37.   The framework for the second prong, however, was not.

At the time of Appellant's 2016 trial, the trial court believed, consistent with this Court's precedent, that the *Briseno* factors were the proper standard for assessing appellant's adaptive functioning for purposes of his claim of intellectual disability.  The Supreme Court, however, has now enlightened us through its *Moore I* and *II* decisions that the use of such considerations in evaluating moral culpability for the death penalty is improper.  Therefore, as shown below, the trial court's adherence to the *Briseno* factors resulted in the jury following a federally non-compliant framework for evaluating appellant's claim under the second prong.

Every aspect of the punishment trial was layered with an emphasis on the *Briseno* factors—from the trial court's limitations on the experts' testimony, to the State's presentation of evidence and argument, to the judge's statements in front of the jury. Both in front of the jury and outside of its presence, the trial court directed the defense experts to tailor their testimony to follow *Briseno* and ensure they did not "mislead" the jury into thinking that the DSM-5 or AAIDD were authorities used in Texas.  The defense experts complied and testified about various aspects of the *Briseno* standard, including the opinions of laypersons about whether appellant was intellectually disabled, appellant's ability to lie effectively, and whether appellant exhibited adaptive strengths during his crimes. The State then reinforced the court's instructions by eliciting statements from both Reschly and Fabian on cross-examination confirming that the jury was bound to follow *Briseno*.

The State's expert Price testified in detail regarding each of the seven *Briseno* factors. Specifically, Price and the prosecutors emphasized the importance of lay opinions in determining adaptive abilities under *Briseno*. In addition, Price and Clayton relied upon appellant's perceived adaptive strengths, rather than focusing on adaptive deficits in reaching their conclusions. *See Moore I,* 137 S. Ct. at 1050 (stating that "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*") (emphasis in original). Price also supported the State's position that appellant's adaptive deficits were related to a personality disorder instead of intellectual disability. Then, the State's arguments to the jury emphasized that clinical standards are "not Texas law." Echoing the trial court's position that *Briseno* was the only governing standard, the State repeatedly sought to undermine the opinions of appellant's experts by pointing out that they had followed clinical standards, rather than *Briseno*. Given the overwhelming and pervasive emphasis on *Briseno* coming not only from the testimony and arguments, but also from the trial court's comments and verbal instructions, Appellant was unable to challenge the jury's impression that *Briseno* was the sole standard to be considered.

The Supreme Court has provided a clear directive: the *Briseno* factors "may not be used" to assess intellectual disability. *Id.* at 1044. In light of this mandate from *Moore I*, and based on the trial court's and State's emphasis of the *Briseno* factors which pervasively influenced the parties' presentation of evidence and arguments, we must conclude that the jury's assessment of appellant's adaptive functioning was impeded. With such impediment, appellant was denied a fair evaluation of his claim of intellectual disability under the

appropriate constitutionally-compliant standard. *Id.* at 1044, 1051 (holding the *Briseno* factors draw no strength from Supreme Court precedent and present an "unacceptable risk" that intellectually disabled persons will be executed).

Additionally, to the extent that the matter of harm is not already apparent from the foregoing discussion, we can conclude with little effort that the constitutional error in this case was not harmless beyond a reasonable doubt. *See* TEX. R. APP. P. 44.2(a) (constitutional error requires reversal "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment"); *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007) (relevant question is "whether there is a reasonable possibility that [the constitutional] error moved the jury from a state of non-persuasion to one of persuasion on a particular issue"). As evidenced by the note they sent during deliberations, it is apparent that the jurors relied on the *Briseno* factors in making their intellectual-disability determination.

Even aside from the jury note, we cannot confidently say how removing the influence of *Briseno* would have affected the jury's weighing of the experts' testimony because their testimony on the issue of adaptive functioning was inextricably intertwined with the *Briseno* factors. The evidence on both the adaptive-functioning prong and the age-of-onset prong was contested.[14] Given that the jury rendered only a general verdict on the question of

---

[14]     We further note here that, with the exception of State's expert Clayton who administered no IQ testing to appellant, all of the remaining experts testified that appellant satisfied the first prong due to his IQ scores falling below the 70 cutoff. The evidence on the first prong was, therefore, largely uncontested.

appellant's intellectual disability, we cannot know whether the jury decided the special punishment issue based on its rejection of appellant's evidence of adaptive functioning under *Briseno*, or based on its rejection of his age-of-onset evidence.[15] The jury's determination of intellectual disability very well may have been based on an impermissible consideration of the *Briseno* factors in violation of appellant's constitutional rights. As such, we must conclude that the error was not harmless beyond a reasonable doubt and appellant is therefore entitled to a new punishment hearing.

### E. Appellant Preserved Error

Having concluded that the record establishes harmful error, we must now address the State's preservation argument. The State contends that appellant did not preserve his complaint in his fourth point of error because he failed to object during the testimony of Fabian and Price, and did not object to the State's closing argument on *Briseno*. This argument lacks merit.[16]

---

[15] At oral argument in this case, the State conceded that this case involves error of a constitutional dimension. However, the State contended that the error was harmless beyond a reasonable doubt because the State's evidence regarding age of onset conclusively refuted appellant's claim of intellectual disability. Specifically, the State contended that Price's testimony opining that appellant's methamphetamine use had caused his low intellectual functioning was so persuasive that, regardless of the evidence on the adaptive-functioning prong, the jury nevertheless would have rejected appellant's claim. We disagree. Price's testimony was disputed by appellant's experts, who opined that appellant had low intellectual functioning as a child as shown by his educational records and that his adult drug use alone could not have caused his low intellectual functioning. In light of this conflicting evidence, and given the state of the record generally, we cannot agree with the State that the error was harmless on this basis.

[16] Because we find that appellant preserved his fourth point of error, we need not decide here whether any objection was required to preserve the claim for our review. *Cf. Garza v. State*, 435 S.W.3d 258, 267 (Tex. Crim. App. 2014) (noting that "categorical bans" striking down

(continued...)

Appellant filed a pre-trial "[Motion] To Use Clinical Definition of Intellectual Disability," arguing that the *Briseno* factors deviated too far from the clinical definitions relied on by Supreme Court precedents and created "an unacceptable risk that a person with intellectual disability will be executed" in violation of the Eighth Amendment. The trial court denied this motion at a pretrial hearing.

Although appellant did not object to the admissibility of particular testimony, he argued prior to trial that Texas's law on the intellectual disability issue violated the Eighth and Fourteenth Amendments. We hold that the pretrial motion and hearing adequately preserved appellant's claim challenging the constitutionality of Texas's pre-*Moore I* legal framework. *See Estrada v. State*, 313 S.W.3d 274, 308-10 (Tex. Crim. App. 2010) (finding challenge to constitutionality of state statute preserved where challenge raised pre-trial).

The record also shows that, despite the pre-trial ruling, appellant objected to the limitation of his experts' testimony to the *Briseno* factors during a *Daubert* hearing preceding Reschly's testimony:

> I would object to any limitation of the Court of Dr. Reschly's testimony in that regard in that it improperly limits his expert testimony because he can talk to relevant issues related to making a diagnosis of intellectual disability under [*Atkins*], [*Hall*], and the United States [C]ode versus Texas law. And that's what [Reschly] does on a daily basis. It's part and parcel of his underlying opinions, and it unduly limits the right, the defense's right to present a

---

[16](...continued)
sentencing practices are not dependent on a trial objection because failure to apply them "carries a significant risk that a defendant faces a punishment that the law cannot impose upon him because of his status or offense"); *Ex parte Maxwell*, 424 S.W.3d 66, 72 n.25 (Tex. Crim. App. 2014) ("Lower courts have uniformly held that *Atkins* applies retroactively to collateral proceedings as well as cases on direct appeal.").

complete defense under [*Holmes v. South Carolina*[17]] and unduly burdens [appellant's] rights under the 4th, 5th, 6th, 8th, and 14th Amendments and the Texas Constitution, Article I, Section 19.

The trial court overruled appellant's objections and required Reschly to edit his presentation to conform with Texas law under *Briseno*. The trial court made it clear that *Briseno* was the controlling law and that it would not allow jurors to be told otherwise. Fabian and Price testified after Reschly. When Fabian attempted to testify about his diagnosis of appellant under the current medical criteria, the trial court instructed him that *Briseno* was controlling authority. The trial court further stated before the jury that *Briseno* is the appropriate standard to use when determining intellectual disability.

It is generally accepted that when a trial court overrules a pretrial motion to suppress, the defendant need not subsequently object to the admission of the same evidence at trial to preserve error. *Garza v. State*, 126 S.W.3d 79, 84 (Tex. Crim. App. 2004). The same rationale applies here, as appellant did not need to continuously object each time the trial court required the parties to conform to *Briseno*.

### F. Conclusion

In light of *Moore I* and *Moore II*, and based upon our review of the trial record in this case, we hold that appellant is entitled to a new punishment hearing. We sustain point of error four.

Regarding appellant's argument in point of error three that the evidence was sufficient to show that he was intellectually disabled under the standard set out in *Moore I*, we do not

---

[17]     547 U.S. 319 (2006).

address that issue in this opinion because it was inadequately briefed and, even if properly briefed, could not afford Appellant any greater relief than what we are already granting.

Appellant's claim in his third point of error is that the jury's verdict rejecting his intellectual-disability claim was against "the great weight and preponderance of the evidence" and that he is therefore entitled to have his sentence reformed to life imprisonment. Aside from generally citing the substantive law on intellectual disability, Appellant does not cite any authority in this section of his brief to support his assertions regarding the appropriate standard of review or remedy. Thus, this point of error is inadequately briefed. *See* TEX. R. APP. P. 38.1(i). Further, appellant's claim would be construed as invoking the factual-sufficiency standard that applies to an appellate court's review of the jury's rejection of an affirmative defense on which the defendant bore the burden of proof. *See Matlock v. State,* 392 S.W.3d 662, 671 (Tex. Crim. App. 2013) (stating that in the factual-sufficiency review of a rejected affirmative defense, the court views the evidence in a neutral light and considers whether "the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased"); *Neal v. State*, 256 S.W.3d 264, 273 (Tex. Crim. App. 2008) ("In reviewing the sufficiency of the evidence to support a finding on [intellectual disability], we examine whether the finding is so against the great weight and preponderance of the evidence so as to be manifestly unjust.") (citations and internal quotations omitted).[18] Given the nature of

---

[18] Although this Court in *Brooks v. State,* 323 S.W.3d 893 (Tex. Crim. App. 2010), abolished factual-sufficiency review with respect to the elements of a criminal offense for which

(continued...)

appellant's factual-sufficiency claim, he would be entitled only to the same relief he is already receiving through our resolution of point of error four—that is, a new trial on punishment. *See Matlock,* 392 S.W.3d at 672 (holding that if in "a factual-sufficiency review . . . the evidence supporting the affirmative defense so greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, then the appellate court may reverse the trial court's judgment and remand the case for a new trial."). Therefore, because the remedy for a meritorious claim in this context would be a new punishment trial and not reformation of the sentence, appellant would receive no additional relief through a review of his factual-sufficiency claim.[19]

## IV. Remaining Points of Error

In his fifth point of error, appellant contends that he received ineffective assistance of counsel during the punishment phase when his counsel introduced violent acts by other inmates in prison, failed to file motions in limine, and failed to prevent the State from introducing inadmissible and harmful evidence of violent acts by inmates. In point of error six, appellant complains that the State engaged in egregious and harmful misconduct during closing arguments at the punishment phase. Even if we were to resolve these claims in

---

[18](...continued)
the State bears the burden of proof beyond a reasonable doubt, we have since clarified that factual-sufficiency review remains proper for affirmative defenses upon which the defendant bears the burden of proof. *See Butcher v. State,* 454 S.W.3d 13, 20 (Tex. Crim. App. 2015).

[19] In his reply brief, appellant cited the standard governing a claim of legal sufficiency in this context, as opposed to factual sufficiency. Although appellant is correct that both factual and legal sufficiency review would be appropriate in the context of reviewing a jury's rejection of an affirmative defense, *see Matlock,* 392 S.W.3d at 667, we decline to address appellant's legal sufficiency claim when it was raised for the first time in his reply brief.

appellant's favor, he would only be entitled to a new punishment hearing, which is the same relief that he will receive through our disposition of point of error four. Therefore, we need not address these moot points of error separately. Points of error five and six are overruled.

In his seventh point of error, appellant posits that the Eighth and Fourteenth Amendments prohibit the execution of the mentally ill. In his eighth point of error, he argues that Article 37.071's definition of "mitigating evidence" is unconstitutional as applied to him because it limits the Eighth Amendment concept of mitigation factors that render a capital defendant less morally blameworthy. We have previously rejected each of these arguments and we are not persuaded to revisit them here. *See Devoe v. State*, 354 S.W.3d 457, 473 (Tex. Crim. App. 2011) (mental illness); *Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010) (mitigating evidence definition). Points of error seven and eight are overruled.

In point of error nine, appellant complains that the trial court committed reversible error by denying his request for a pretrial determination of intellectual disability.[20] The outcome of this claim could not afford appellant any additional relief because appellant is receiving a new punishment hearing through our disposition of point of error four. Further, the issue of appellant's eligibility to receive a death sentence does not affect the guilt/innocence portion of appellant's trial. *See Atkins*, 536 U.S. at 321 (holding that death is an unconstitutional and excessive punishment when applied to intellectually-disabled defendants). Therefore, point of error nine is overruled.

---

[20] This issue is currently before the Court in a motion for rehearing in another case. *See Petetan v. State*, No. AP-77,038 (Tex. Crim. App. March 8, 2017); *reh'g granted*, No. AP-77,038 (Tex. Crim. App. Oct. 18, 2017).

**V.     Conclusion**

We affirm the judgment of the trial court as to guilt.  We reverse the judgment of the trial court as to punishment and remand the cause for a new punishment proceeding.

DELIVERED: February 12, 2020
DO NOT PUBLISH